[Crim. No. 23869. Second Dist., Div. Three. Aug. 29, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
FRED MENDEZ MEDINA et al., Defendants and Appellants.

**COUNSEL**

David E. Kenner and Alan R. Baum, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POTTER, J.**—Defendants, Fred Mendez Medina and Danny Wayne Townsend, were charged by information filed on June 28, 1972, with two counts of murder. (Pen. Code, § 187.) The information alleged that defendants, on or about April 8, 1972, with malice aforethought, murdered Dori Ann Haines (count I) and Cheryl Ann Monticello (count II). Both defendants pleaded not guilty. They were tried together before a jury. The jury was impaneled on February 1, 1973, and trial continued for 25 days. On the fifth day of deliberation, the jury returned verdicts finding both defendants guilty on each count of murder in the first degree. The matter was then continued until May 10, 1973, at which time defendants' motions for a new trial were denied. The court also denied defendants' motions requesting the court to commit them to the California Youth Authority or refer them to the Director of Corrections pursuant to Penal Code section 1202b. Thereupon, both defendants were sentenced to state prison on each count for the term prescribed by law (life in prison), with the execution of sentence on count II for each defendant stayed until such time as each defendant is paroled on count I, at which time the sentence on count II is to go into effect. Both defendants appeal from the judgments of conviction.

The facts of this case are not very pleasant. As related by the prosecution witnesses, they are a shocking commentary upon the degree of degenerate conduct which can result from juvenile drug abuse, and the tragic consequences thereof. Midday on April 8, 1972, defendants Fred Mendez Medina, aged 20, and Danny Wayne Townsend, aged 18, together with their friend Edwin E. Vaughn, aged 18, Lisa Beth Gleitsman, a girl friend of Townsend, aged 17, and Virginia Lou Walton, a girl friend of Medina, aged 15, left the residence of Vaughn's brother-in-law, a ranch in the foothills west of the Chatsworth Reservoir in the west end of the San Fernando Valley, to go to the beach. They were all in a blue 1954 Chevy pickup truck with white fenders owned by defendant Medina. They stopped to get gas for the truck at Zody's on the corner of Roscoe and Topanga Canyon Boulevards. At the gas station they picked up two hitchhikers, Dori Ann Haines and Cheryl Ann Monticello, ages 15 and 16, respectively. The seven then drove in the truck over Topanga Canyon to a beach somewhere north of Malibu. After about an hour at the beach they all returned to the San Fernando Valley via Malibu Canyon and then drove up Woolsey Canyon Road or, as it is locally known, "Rocketdyne Road," in Woolsey Canyon in the hills west of the Chatsworth Reservoir. They parked the truck at a remote and isolated site off a dirt road about a quarter of a mile from Rocketdyne Road. Sometime later, about the time it was beginning to get dark, the two defendants, Vaughn, Gleitsman and Walton left the

area in the truck, and returned to the residence of Ann Todd at the Fountain of the World in Box Canyon, where both defendants were then residing. Dori and Cheryl, however, never left the site alive.

On April 17, 1972, three young men, while shooting tin cans near the site, off Rocketdyne Road where defendant Medina's truck had been parked, found what appeared to be human remains covered with brush. The body was later identified as that of Dori. The body of Cheryl, also covered with brush and debris, was found on April 21, 1972, by two women who were hiking in the same area.

As shown by the testimony of Dr. Eugene Carpenter, the pathologist who performed autopsies on each of the victims, both died as a result of multiple stab wounds to the heart with a knife or knives. Dori was stabbed around 50 times. Most of the wounds were made by a single-edged "hunting" knife, although several wounds had been made by a double-edged knife. Cheryl suffered approximately 35 stab wounds, all of which were made by a single-edged knife. Both victims had severe basal skull fractures and their throats had been cut. Dori had, in addition, suffered a nonfatal blow with a blunt instrument to the forehead. In addition to his testimony concerning the wounds, Dr. Carpenter testified that both the victims had consumed, shortly before their death, a quantity of barbiturates—specifically, pentobarbital sodium or, as it is referred to on the street, "Yellows."

On May 6, 1972, Vaughn, having heard from his sister that the investigating officer had called and desired to talk to him, called and arranged an appointment with him. On that date he gave a statement to the officer implicating both defendants and Gleitsman and Walton. On May 9, 1972, both defendants were arrested, as were Gleitsman and Walton.

From May 6 through May 15, 1972, discussions were conducted between Vaughn and the prosecutor which culminated in his giving a tape-recorded statement on May 15, 1972, on the basis of which he was, on June 14, 1972, granted immunity from prosecution pursuant to the provisions of section 1324 of the Penal Code. Like discussions occurred between the prosecutors and Gleitsman and Walton after their arrest which produced tape-recorded statements from each of them on May 10, 1972 and, on the basis of these statements, orders granting immunity pursuant to section 1324 of the Penal Code were made on May 11, 1972.

Virtually all of the direct evidence of what occurred between the time Dori and Cheryl joined the others in the truck at Zody's and the time of their deaths was contained in the testimony of the three witnesses to whom immunity was granted—Vaughn, Gleitsman and Walton. No one of these witnesses claimed to have seen and to have recalled all of the events oc-

curring during this time span. There are some inconsistencies between their three versions of the facts they did recall, and in some respects it is almost certain that the whole truth was not told by two of them. Nonetheless, if credence is given to a composite of the consistent and not inherently unbelievable portions of this testimony, it is possible for a trier of fact to make a reasonable determination of essentially what happened. The following version of the facts is the most likely result of such process.

Both of the defendants and Vaughn, Gleitsman and Walton were together at a party the night before the day of the murders. The party was at the ranch of Vaughn's brother-in-law, and various barbiturates were consumed by those in attendance. The following morning they all got together again at the ranch and left in defendant Medina's pickup truck to go to the beach. They stopped at Zody's for gasoline and while there, or upon leaving, they picked up Dori and Cheryl who were hitchhiking. The entire party, including the hitchhikers, consumed more barbiturates (i.e. "yellows") either at the gas station or during a subsequent stop between there and the beach. Upon reaching the beach Dori and Cheryl were furnished and consumed additional barbiturates. Also at the beach there was a pairing off of Vaughn with Cheryl and defendant Townsend with Dori. Upon observing defendant Townsend showing sexual interest in Dori, Gleitsman, who considered herself his girl friend, returned to the truck in a fit of jealousy and took two barbiturates (in addition to the two she had had earlier in the day). The bag in which the pills were kept was then taken from her by defendant Medina, who feared she might overdose.

The party then left the beach in the truck. Defendant Medina was driving and Gleitsman and Walton were in the cab with him. Defendant Townsend and Dori were in the bed of the truck, as were Vaughn and Cheryl. When Gleitsman observed Townsend kissing Dori, she smashed the window in the back of the cab with her fist.

Defendant Medina's driving became so erratic that Walton asked him to let Vaughn drive. As Vaughn took the wheel, defendant Medina asked him about a place where they could "finish" the party. They drove without incident to the remote site on the dirt road off Rocketdyne Road where the truck was parked on a level clearing or turnout beside the road. The turnout was at a higher elevation than the adjoining portion of the road and it was bordered on the side away from the road by an elevated outcropping of very large boulders. A path ran around one end of the outcropping to a lower elevation beyond. It was then about 2 p.m. When the truck was parked both defendants and Gleitsman, Walton and Dori got out of the truck and left Vaughn in it with Cheryl. Vaughn and Cheryl

talked for a while; then he had intercourse with Cheryl which he claimed was consensual, though he described her as intoxicated at the time.

While Vaughn and Cheryl were in the truck, defendant Medina and Dori, accompanied by both Gleitsman and Walton, proceeded out of view to a flat space among the boulders. Defendant Medina told Dori to "give him head" (orally copulate him). When she asked why, he said because he wanted her to. When Dori declined, Gleitsman and Walton first made fun of her and then, when she started to cry, she was struck by one of the girls and the other took a swing at her but missed, and both girls told her to do what defendant Medina said. Dori then commenced complying with their demands, and both Gleitsman and Walton wandered off. They returned several minutes later and Walton brought a blanket belonging to her which she had obtained from the truck. About that time defendant Medina, who was still being orally copulated by Dori, announced that his resulting erection was suitable for intercourse and ordered Dori to remove her clothing. He asked for and received the blanket. When Dori was undressed defendant Medina proceeded to have intercourse with her on the blanket. Gleitsman and Walton again wandered off.

Gleitsman returned about the time that defendant Medina concluded having intercourse with Dori, and she kicked Dori's clothing over the steep side of the rock outcropping.

About this time Gleitsman heard Vaughn and Cheryl leave the truck cab, and she returned to the truck to meet defendant Townsend and Vaughn and Cheryl there. Vaughn slapped Cheryl and informed defendant Townsend that she was a "good piece of ass," whereupon defendant Townsend and Cheryl left on the path that went around the side of the outcropping to the slope below.

Vaughn then proceeded to the place among the boulders where Dori had been left nude on the blanket and he had intercourse with her, which he also claimed was consensual. He observed, however, that she was intoxicated.

About this time a young boy on a motorbike arrived in the vicinity of the truck where he remained for several minutes. While he was there Gleitsman, who was looking for Townsend, spoke to him. Walton also came up to this location during the conversation.

Meanwhile, defendant Townsend had found a cave on the lower side of the rock outcropping. He lifted Cheryl up into the cave with him where he proceeded to have intercourse with her. Sometime later Walton found them so engaged. She told defendant Townsend, "Danny, wait until Lisa

hears this one." Walton then told defendant Townsend that she wanted to talk to Cheryl. Defendant Townsend helped Walton get up into the cave and then left her there with Cheryl.

Walton then asked Cheryl "why she had done it" with both Vaughn and defendant Townsend. When Cheryl didn't answer, Walton started a fight with her. They wrestled about in the cave and ultimately both of them fell out of the cave. Cheryl rolled to the bottom of the path and just lay there. While these events at the cave were occurring, Vaughn completed his act of intercourse with Dori among the boulders and then left her stranded on the blanket without her clothes and returned to the truck.

Gleitsman soon found Dori in the place and state that Vaughn had left her. Dori was still crying, and when she attempted to apologize to Gleitsman for defendant Townsend's attentions to her at the beach earlier in the day and said she was sorry for "taking away" Gleitsman's boyfriend, Gleitsman became enraged. She kicked Dori in the shoulder and followed this up with a blow to her forehead, using a hand-held rock some four inches in diameter. Dori remained prone on the blanket after this assault and Gleitsman then broke off the attack.

At this juncture Walton summoned Gleitsman to the scene of her altercation with Cheryl to assist her. When she arrived at the point where Cheryl had fallen, she joined in some verbal abuse that was taking place, and ultimately Cheryl was struck in the head by a large rock.[1]

Defendants, having observed the effects of the girls' attacks upon Dori and Cheryl, joined Vaughn at the truck and advised him that they were going to have to kill Dori and Cheryl. When he asked why, defendants said it was necessary because the girls would talk. Vaughn, who was not armed and knew that defendants were each armed with knives, did not argue with them. He observed defendants depart together in the direction of Dori. Defendants found Dori where she had been left at the conclusion of Gleitsman's attack. Defendant Townsend was observed by Gleitsman commencing the stabbing attack upon Dori. He was joined in the attack by defendant Medina. The multiple stab wounds which caused Dori's death were inflicted with both defendants' knives.

Defendant Townsend then proceeded toward the place where Cheryl

---

[1] Walton's story that she did not see where this rock came from, and Gleitsman's claimed inability to recall events for a period of time in this interval, make almost inescapable the conclusion that it was one of them, more probably the jealous, violent Gleitsman, that struck this blow and that it was not part of a later stabbing attack upon this victim by defendant Townsend.

lay. As he passed the truck he was seen by Vaughn taking the path around the outcropping to the lower slope. Soon thereafter defendant Medina traversed the same route and was seen by Vaughn to have his bloody knife in his hand.

Defendant Townsend reached Cheryl ahead of defendant Medina and was seen by Walton to stab Cheryl in the throat and chest. After Cheryl had been stabbed four or five times, Walton started back up the trail toward the truck and heard defendant Townsend complaining that "his knife didn't stick in good enough." Before she reached the truck, Walton met defendant Medina and Vaughn, who had fallen in behind Medina when he saw him head down the trail towards Cheryl with his bloody knife in hand. She noted that defendant Medina had large blood stains on his clothing and that Vaughn was white as a sheet. By the time Vaughn and defendant Medina arrived on the scene Cheryl was already dead from multiple stab wounds.

All five in the party joined in helping to cover the bodies of Dori and Cheryl. Then they returned to the truck. Defendant Townsend stabbed his knife into the bed of the truck and said, "Wasn't it spiffy the way I slit that one girl's throat?" Vaughn told defendants that they had been stupid. Defendants stated that if anyone asked, they had been to Lake Piru for the day.

Although the testimony of Vaughn, Gleitsman and Walton constituted the only direct evidence of the circumstances surrounding the deaths of Dori and Cheryl, a number of other witnesses were called by the prosecution to corroborate their testimony.

Walter Collins, a young acquaintance of defendants, testified that both defendants, along with Vaughn, Walton and Gleitsman, were seen by him together in defendant Medina's truck on the morning of April 8, 1972, at the "Reservoir Bar," which is located between the ranch and Zody's. They invited him to go with them to the beach.

Officer Robert Searle of the Los Angeles Police Department testified that on April 8, 1972, he was off duty and fueling his car at Zody's about midday. He observed both defendants in the station with another young Caucasian male and two teen-age Caucasian females. Officer Searle's description of the male companion would fit Vaughn.

James Maglieri testified that he was employed as a service station attendant at Zody's, and on April 8, 1972,[2] he observed both defendants in

[2]He was able to date this incident by reference to an argument which occurred between the defendants and Officer Searle on that date.

a pickup truck, described as resembling defendant Medina's truck, in the station with a group of young men and women. While defendants were there, Maglieri saw defendant Townsend with a hunting knife in his hand when he started to get out of the truck. Maglieri also testified that he observed two hitchhiking girls on Topanga Canyon Boulevard near the corner. He described these girls as being one dark-haired girl and the other light-haired. Dori and Cheryl fit that description. He was not absolutely certain as to the date of this last observation, though he was sure that it was on an occasion when defendant Medina's truck was in the station.

Larry Deidrich, a 12-year-old boy, testified that he went riding on his motorcycle in the hills west of the Chatsworth Reservoir on the afternoon of April 8, 1972. He stated that he observed a truck, resembling defendant Medina's pickup, parked on the clearing at the scene of the murders. He stopped in the vicinity of the truck to let his bike cool off. When he arrived there were two people, one male and one female, in the cab of the truck. He also stated that later he was approached by a girl whose dress and appearance corresponded to that of Gleitsman, and that she asked him if he was alone. They were joined by another girl, apparently Walton, whom he could not recall having joined in the conversation. Deidrich testified that he left the area after about 15 minutes and when he returned about 6 p.m., the truck was gone.

Mrs. Ann Todd, in whose home both the defendants resided along with Mrs. Todd's 12-year-old daughter, Cornelia, testified that at some time around 5 p.m., on April 8, 1972, she observed both defendants, together with Gleitsman and Walton, coming up the stairs to the house where they were joined shortly thereafter by Vaughn. All of them appeared to her to be intoxicated, especially Gleitsman and Walton. Mrs. Todd was preparing to take laundry to the laundromat and she testified that defendant Medina gave her his jacket to be included in the wash.

Sheryl Henderson, a young friend of Mrs. Todd's daughter, who had been to the beach with her on that day, testified that on April 8, 1972, she observed both defendants together with Vaughn, Gleitsman and Walton, ascending the stairs to Mrs. Todd's house late in the afternoon. According to Miss Henderson, both Gleitsman and Walton were under the influence of some intoxicating substance. Miss Henderson also observed that Vaughn, for some time after his arrival, "just . . . sat on the couch with his head down."

Cornelia Todd also testified about the arrival at her mother's house of both defendants, together with Vaughn, Gleitsman and Walton, in the late afternoon of April 8, 1972. In addition, she described an incident which

occurred on the early morning of either the 7th or 8th of April 1972, in a bedroom of Mrs. Todd's home which was occupied by both defendants. Present on that occasion were Cornelia, defendant Townsend, defendant Medina, and another young girl named Kim Bertsch. Cornelia testified that Kim's father entered the room unexpectedly and threatened defendant Townsend with physical violence if he did not stay away from his daughter. Defendant Townsend responded by taking his knife from the stand between the beds, where Cornelia had seen it many times before, and jumped up with the knife in his hand. Cornelia described the knife as a hunting knife. On that same occasion, according to Cornelia, defendant Medina made a motion with his hand toward a portion of the mattress of his bed. Cornelia knew he had a knife there because, on a prior occasion and at a request of defendant Medina, she had placed it at that location. She identified a double-edged knife which was received in evidence as Medina's knife which she had so placed.[3]

Kim Bertsch also testified about the early morning incident at which defendant Townsend displayed his knife. Kim's description of the matter corresponded with Cornelia's report that when her father threatened defendant Townsend, he grabbed his knife from the table between the two beds. She also described it as "a hunting knife."

Mrs. Verne Ellison testified that she was a clerk employed at the Chatsworth Lake Junior Market on May 9, 1972. She said that she was well acquainted with defendant Townsend and that he was in the store making a purchase on that date when three or four young people entered the front door in a hurry and said, "There's cops outside" and "Are they after you, Danny?" or "They are after you, Danny." She described defendant Townsend's reaction as looking terrified. He first glanced toward the back door and then, abandoning his purchase on the counter, dashed out the front door.

David Bullard, another market employee, testified that he saw defendant Townsend run around the back of the store. The witness further observed that defendant was followed by the police car and that he was shortly returned in handcuffs.

Deputy Sheriff John R. McCrane testified to the conduct of defendant Townsend at the moment of his arrest. According to McCrane, he observed a large bush behind the market with defendant Townsend hiding

---

[3]This knife was removed from Walton's home after her arrest. Gleitsman also resided in this residence at the time. Its presence there was explained by Gleitsman who stated that defendant Medina entrusted it to her some two weeks after the murder.

beneath it. He was crouched on all fours. The deputy informed defendant Townsend that he was under arrest for murder.

Numerous other witnesses were produced by the prosecution to corroborate the testimony of Vaughn, Gleitsman and Walton. These included several criminologists who made inconclusive tests of substances found on clothing and boots worn by the defendants, on Medina's knife, and on the door of Medina's truck. Other witnesses testified to the circumstances of defendant Medina's arrest. It is unnecessary to discuss any of this testimony in detail since its contribution to the corroboration of the testimony of Vaughn, Gleitsman and Walton was not sufficient to be determinative of any issue necessary to decide in this appeal.

## Questions Presented

The briefs filed in behalf of defendants total over 300 pages in length. There are 14 specifications of claimed error in the brief of defendant Medina and 3 more added in the supplemental argument in behalf of defendant Townsend. The categories of errors urged include (a) alleged deprivation of a fair trial by the use of prosecution witnesses granted conditional immunity and by the prosecutor's misconduct constituting *Griffin* error; (b) claimed errors in the admission of evidence, the probative effect of which was outweighed by its prejudicial or inflammatory effect; (c) refusal of the court to provide means by which defendants could procure certain evidence in support of defendants' contentions; (d) failure to instruct that the three principal prosecution witnesses were accomplices as a matter of law; (e) denial of a motion to acquit under section 1118.1 of the Penal Code for lack of corroboration of the accomplices' testimony; (f) claimed lack of a unanimous verdict on either of two alternate theories of first-degree murder; and (g) the imposition of consecutive life terms on two counts of murder.

The two constitutional errors urged by defendants (category (a) above) are dispositive of this appeal and require reversal of the judgment. Full discussion of the other 13 claims of error would extend this opinion beyond reasonable length; consequently, only those contentions which bear upon the disposition of the constitutional claims, or which would preclude retrial of the case if sustained, will be discussed in any detail.

### The Orders Granting Conditional Immunity to the Three Principal Prosecution Witnesses Denied Defendants a Fair Trial

The prosecution's case against defendants depended, as noted above, upon the testimony of the three witnesses who were allegedly present with

defendants at the scene of the murders. Each of these witnesses (Edwin Vaughn, Lisa Gleitsman and Virginia Walton) were the subject of orders under section 1324 of the Penal Code compelling them to "answer such questions and produce such evidence in the case of the People of the State of California [against defendants] . . . as may be material, competent and relevant. . . ." Each of said orders was based upon a "waiver," signed by the witness, stating (1) that the refusal of the witness to testify in the case "is based upon the ground of self-incrimination," (2) waiving the issuance of an order to show cause and hearing, and (3) consenting to the issuance of the order compelling the witness to answer questions. In each instance, the order stated that the "witness shall not be prosecuted or subjected to penalty or forfeiture for or on account of any question, fact or thing, which, in accordance with this order, the witness was required to answer or produce." In each case, however, the immunity was conditional. The language used in the orders applicable to Gleitsman and Walton was "subject to the conditions that the witness not materially or substantially change her testimony from her tape-recorded statement already given to the law enforcement officers on May 10, 1972, and not resort to silence, whether or not under order of contempt, nor feign lapse of memory to at least that much given in the aforementioned tape-recorded statement, for otherwise this order of immunity will be void and of no effect."[4]

Defendants objected to these witnesses being permitted to testify while subject to such a conditional immunity order. The objection was overruled and their testimony was given pursuant to the orders.

Defendants contend that each of these witnesses was an accomplice liable to prosecution for the murders of which defendants were convicted, and that the threat of prosecution therefor contained in the conditional immunity orders denied to defendants any effective cross-examination of the witnesses, thereby depriving them of the fundamental right to a fair trial. We agree.

The testimony of these three witnesses outlined in the statement of facts above showed them to be accomplices liable to prosecution for the murder of Cheryl and Dori. At the request of the prosecution, felony-murder instructions (CALJIC Nos. 8.21, 8.26 and 8.27), in each of which the crime of rape was designated as the felony, were given as a basis (in addition to premeditation) for finding defendants guilty of murder of the first

---

[4]The terms of the orders were identical with respect to the witnesses Walton and Gleitsman. The only difference between them and the order covering the witness Vaughn was the substitution of the word "his" in two places for the word "her" and the substitution of the date of May 15, 1972, for the date of May 10, 1972.

degree. The giving of these instructions was entirely appropriate under the circumstances. It is probable that the verdict of guilty of first degree murder, rendered against each of the defendants, was based on these instructions since it was the theory must strongly supported by the evidence.

The evidence indicated that the two victims, who were only 15 and 16 years of age at the time, were supplied by defendants with intoxicating drugs capable of preventing resistance to the acts of sexual intercourse on their part. It also supported a finding of acts of violence and menace against each of the outnumbered victims of a nature reasonably calculated to prevent their resistance under the circumstances. The testimony of Vaughn to the effect that defendants expressed the intent to kill the girls to prevent their disclosure of the offenses committed against them reinforces this interpretation. The taking of such extreme steps to preclude discovery would be far less logical if the acts of oral copulation and intercourse described had all been "consensual." If rape was involved and if, as above noted, both victims had sustained substantial injuries as a result of being struck by rocks wielded by Gleitsman or Walton, defendants were in deep trouble. In fact there was no sure way for them to escape probable prosecution for serious crimes short of killing the victims and successfully hiding their remains.

■ Murder committed "in the perpetration of . . . rape" is murder of the first degree and, like any other felony murder, it is shown by evidence that it occurred as part of one continuous transaction in which rape was involved. It is not necessary that the homicide occur while the rape is in progress nor that it be caused by the rape.

Speaking with respect to a felony murder in connection with a rape, our Supreme Court said in *People* v. *Chavez,* 37 Cal.2d 656, 669-670 [234 P.2d 632]: ". . . The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the fenoly [*sic*] before the homicide was completed.

"In *People* v. *Boss,* 210 Cal. 245, 252, 253 [290 P. 881], this court said that the felony murder rule '. . . was adopted to make punishment of this class of crime more certain. It was not intended to relieve the wrongdoer from any probable consequences of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural.' The homicide is

committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction. . . ."

In another rape-murder case, *People* v. *Whitehorn,* 60 Cal.2d 256 [32 Cal.Rptr. 199, 383 P.2d 783], defendant's conviction of first degree murder was affirmed. The evidence showed that he had raped the victim and that a codefendant companion "later" strangled her. Holding that the court properly refused an instruction proffered by defendant which would have required the prosecution "to show that death ensued in consequence of the forcible rape," the court said (60 Cal.2d at p. 264): ". . . The proposed instruction, however, erroneously stated that before the felony-murder rule may be applied it must be shown that death ensued 'in consequence of the forcible rape.' Section 189 of the Penal Code has been construed as not requiring a strict causal relation between the felony and the homicide, and the homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous transaction. (*People* v. *Mason,* 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025]; *People* v. *Chavez,* 37 Cal.2d 656, 669-670.) Statements of the type contained in the proposed instruction are misleading and should not be used in giving instructions on the subject. . . ."

The evidence, however, that supported the instruction on felony murder with respect to defendants equally supported the same charge against the three immune prosecution witnesses. It showed them to be aiders and abettors, and therefore principals, of any rape committed. ▮ An aider and abettor of the underlying felony is equally guilty, along with the killer, of any homicide committed in the perpetration of the felony. (*People* v. *Miller,* 37 Cal.2d 801, 806 [236 P.2d 137]; *People* v. *Waller,* 14 Cal.2d 693, 703 [96 P.2d 344]; *People* v. *Chapman,* 261 Cal.App.2d 149, 165 [67 Cal.Rptr. 601].)

The effect of the condition appended to the immunity orders of each of the principal prosecution witnesses, therefore, was that each of said witnesses was thereby placed by the court in a position of dire peril. If his testimony "materially or substantially" differed from the prior recorded statement he became liable to prosecution for first degree murder and, having disclosed his participation, stood little chance of escaping conviction.

This court dealt with a comparable situation in *People* v. *Green,* 102 Cal.App.2d 831 [228 P.2d 867]. In that case an accomplice was promised immunity from prosecution for his participation in the crime of which defendant was charged on the condition that his testimony at the preliminary

hearing resulted in defendant's being held to answer. When, at the trial, the witness changed his story, his testimony at the preliminary hearing was used against defendant. Presiding Justice Shinn stated the question as follows: "The broad question is whether a conviction may be allowed to stand where it rests chiefly upon testimony of an accomplice, given under a promise of immunity upon the condition that the testimony he is about to give is such as will result in conviction of one jointly charged with the witness. Seldom have reviewing courts been called upon to answer this simple question." (*People* v. *Green, supra,* 102 Cal.App.2d at pp. 834-835.)

The court concluded that the conviction could not stand. In reaching this conclusion, it relied upon two cases. One of them, a Texas decision (*Harris* v. *State,* 15 Tex.App. 629) held the defendant had been denied a fair trial when each of six defendants indicted was told by the district attorney " 'that one of the parties would be released from prosecution and that it would depend upon the statements of each of the accomplices (or parties) to the murder, and the benefits to be derived therefrom, as to whether or not he would be the party released and to be used as a witness.' " (102 Cal.App.2d at p. 835.)

The court's discussion of the other case authority relied upon was as follows (102 Cal.App.2d at pp. 837-838): "The British Columbia Court of Appeal *considered essentially the same grave question* in *Rex* v. *Robinson,* 30 B.C. 369, 70 D.L.R., 755. The accomplice who was about to give his testimony after having made a statement to the police was informed by the court, that in accordance with the practice, he would be examined under an understanding that if he gave his evidence in an unexceptionable manner he would be recommended for a pardon. The reviewing court was of the opinion that the trial judge in the course of the examination gave the witness to understand that when his evidence was reviewed in considering a recommendation for a pardon, it would be expected that his testimony at the trial would be in conformity with the statements he had made to the police. The judgment was reversed. In the course of a clearly reasoned analysis of the situation it was said (pp. 761-762): 'It is obvious that if the witness did get the impression from the Court that unless he told the same story to the Court as he did to the police, he would be executed, then his testimony was tainted beyond redemption and could not, in a legal sense, be weighed by the jury, because the witness was no longer a free agent and there was no standard by which his veracity could be tested or estimated. This is not merely a matter going to the credibility of the witness, but something fundamentally deeper, *viz.,* that by the action of the Court itself the witness was fettered in his testimony and put in so

dire a position that the value of his evidence was not capable of appraisement, the situation being reduced to this, essentially, that while at the outset he was adjured to give his evidence freely and fully, yet later on he was warned that if it was not the same as he had already told the police he would be executed. Such a warning defeated the first object of justice, because what the witness should from first to last have understood was that, at all hazards, he was to tell the truth then in the witness box, however false may have been what he had said before in the police station. It is this element of uncertainty and the impossibility of determining the extent of it that makes this case so peculiar and unsatisfactory, and it cannot properly, in my opinion, be viewed as a question of credibility for the jury but one of frustration of their right to pass upon credibility. If the warnings complained of had taken place after the witness had finished his evidence, they could be said not to have had any harmful result, because they came too late to affect him, but unfortunately, if I may say so with all possible respect, the Judge went on to question him about a crucial matter—what he did with his revolver at the time of the shooting. How can anyone say if he gave a truthful answer to that question, and as to what occurred between him and the prisoner concerning it, when, in his fear, he made a fettered reply which had necessarily to be "the same" as that which he had already told the police, if the shadow of the gallows was to be removed from him by his interrogator? . . . It cannot be denied that the accused was entitled, on every principle of natural as well as forensic justice, to this—that the witnesses brought forward against him should not have been influenced, least of all by the Court itself, however unwittingly, and that such a thing did nevertheless occur, comes clearly, in my opinion, within the expression "that something not according to law was done at the trial—" Cr. Code, sec. 1019, R.S.C. 1906, ch. 146.' " (Italics added.)

Applying the reasoning of the two cited cases, the court continued as follows: "The conclusions announced by the courts in the two cases from which we have quoted furnish a satisfactory, and we think conclusive, answer to the question in our case.

"It is a practice which seems to be approved in all jurisdictions, if the ends of justice will be thereby served, to extend immunity to one jointly charged with crime, upon condition that *he testify fully and fairly as to his knowledge of the facts out of which the charge arose.* This was not the agreement made with Hodge. He was to give testimony that would satisfy the committing magistrate that Green should be bound over for trial; otherwise, he would stand trial with Green, and in view of the testi-

mony he was about to give, would surely have been convicted. It is not a question whether his first testimony was true or false, nor is it to be suspected that testimony was used which was known to the State to be false. We give no consideration to the fact that Hodge changed his story. This bore upon his credibility, which is of no concern in the present discussion. Whether Green be innocent or guilty he has not had a trial in accordance with the law of the land. A miscarriage of justice was occasioned through the use by the State of testimony which, because of the condition upon which immunity depended, was impure, dubious and 'tainted beyond redemption.'" (Italics added.) (102 Cal.App.2d at pp. 838-839.)

We agree that "essentially the same grave question" was involved in *People* v. *Green, supra, Rex* v. *Robinson, supra,* and *Harris* v. *State, supra,* and that a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion. The facts in *Rex* v. *Robinson* are virtually indistinguishable from those presented in this appeal; in fact in *Robinson,* the facts were not as compelling as those herein which require rejection of the tainted testimony. In *Robinson,* the court's comments merely inferred that the promised pardon depended upon the testimony being "the same as he had already told the police." The immunity orders applicable to each of the prosecution witnesses herein expressly so state.

Nothing said in any of the cases relied upon by the People conflicts with the conclusions expressed in *Green.* In *People* v. *Lyons,* 50 Cal.2d 245 [324 P.2d 556], the defendant contended that the use of testimony of accomplices who had pleaded guilty of lesser charges and had not been sentenced at the time they testified deprived him of a fair trial. In rejecting this claim the court said (50 Cal.2d at pp. 265-266): "Defendant, however, urges that since the proffered leniency was obviously conditioned on the accomplices' first testifying against defendant, that testimony was worthless as a matter of law, relying primarily on *People* v. *Green* (1951) 102 Cal.App.2d 831 [228 P.2d 867], and cases therein discussed. But in that case the promise of immunity was conditioned on the accomplice's testimony resulting in the conviction of the defendant. The *Green* case recognizes, at page 838 of 102 Cal.App.2d, that, 'It is a practice which seems to be approved in all jurisdictions, if the ends of justice will be thereby served, to extend immunity to one jointly charged with crime, upon condition that he testify fully and fairly as to his knowledge of the facts out of which the charge arose.' *There is nothing in the present case to indicate*

*that the promises of leniency were conditioned on anything other than the accomplices testifying fully and fairly as to their knowledge of the facts out of which the charges arose.* It follows that the accomplices' testimony was not so inherently incredible as to result in incompetency." (Italics added.)

All that was held in *Lyons* was that the immunity could be conditioned on "the accomplices testifying fully and fairly as to their knowledge of the facts out of which the charges arose." The immunity orders in this case, however, go far beyond that.

*People* v. *Brunner,* 32 Cal.App.3d 908 [108 Cal.Rptr. 501], likewise is not inconsistent with *Green. Brunner* dealt with the enforceability of a witness immunity agreement which had not been submitted to the court for approval. The statement in the opinion to the effect that when a court order is obtained "a promise of immunity from prosecution in exchange for particular testimony amounts to a promise by the witness to testify in a certain way, and the witness who does not so testify will not acquire the sought-for immunity" (32 Cal.App.3d at p. 915) is dictum; moreover, it in no way can be construed as sanctioning the kind of condition here involved, for the court went on to describe what the prosecutor may legitimately bargain for: "In sum, when an immunity agreement is entered into under court sanction, the witness becomes absolutely entitled to immunity 'provided it appears that he acted in good faith and that he testified fully and fairly.' (*Whiskey Cases* (1878) 99 U.S. 594, 595, 598, 599, 600, 602, 604, 605 [25 L.Ed. 399, 400, 401, 402, 403].) . . ." (32 Cal.App.3d at p. 915.)

█ The error involved in the use of such tainted testimony is a denial of the fundamental right to a fair trial in violation of federal constitutional principles. It is unnecessary to decide whether the right to meaningful cross-examination is one of those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error" (*Chapman* v. *California,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]) because, in any event, the error cannot be held harmless "beyond a reasonable doubt." As the court said in *Chapman, supra,* 386 U.S. at pp. 23-24 [17 L.Ed.2d at p. 710]: ". . . An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy,* be conceived of as harmless." The tainted evidence in this case was not only relevant, it was the only evidence which could conceivably have influenced the jury to reach a guilty verdict.

The judgment must be reversed on this ground.

### There Was Prejudicial Griffin Error

In his final summation, the prosecuting attorney made reference at the outset to the fact that there were five percipient witnesses to what occurred at the scene of the murders. He said: "Incidentally, you realize there were five people up there on this thing and three of them were subjected to cross-examination which is a pretty sharp test of truth, and they subjected themselves to cross-examination . . . ." The other two possible witnesses left unaccounted for could not have been anyone other than defendants.

A few minutes later, the prosecutor addressed himself to the credibility of the three accomplice witnesses. He noted that they were not of "sterling character" and "in many ways . . . despicable," and added that due to their drug consumption their perception and recollection may have been imperfect. He continued as follows: "And whatever else we say about them, that they are lying or otherwise, their testimony is unrefuted. No one has come forward and said that it is false. No one has come before you to show you it wasn't that way. You have not heard that.

"So, it is easy to get up here and reel off all the things that is wrong with each one of these individuals and how irresponsible they are, and how they admit they are lying about this and that, and how their minds are warped and so forth; but where has their word been refuted?

"And they were up there on that stand. They were put under oath. They were subject to perjury. . . ."

■ The net effect of these passages in combination was to urge the jury to believe the testimony of the three accomplice witnesses because the defendants, who were the only ones who could have refuted it, did not take the stand and subject themselves to cross-examination and to prosecution for perjury.

Little discussion of authority is necessary to demonstrate that this was *Griffin* [*Griffin* v. *California,* 380 U.S. 609 (14 L.Ed.2d 106, 85 S.Ct. 1229)] error. After the trial in this matter and the denial of the motion for a new trial, our Supreme Court definitively disposed of any question in this respect in *People* v. *Vargas,* 9 Cal.3d 470 [108 Cal.Rptr. 15, 509 P.2d 959]. The opinion in that case collects all the pertinent prior authorities and synthesizes their holdings in a fashion which is conclusive of the issue here. In the *Vargas* case, defendant and his codefendant chose not to testify and presented no defense by way of alibi or otherwise. They were charged with and convicted of the robbery of Mr. Olness. Both the victim and Miss Campio, a witness to the robbery, positively identified Vargas as

one of the robbers. The latter, a waitress in the restaurant from which the defendants followed Olness to rob him, had known Vargas as a customer of the restaurant for some time.

In his closing argument the prosecutor initially commented that the defendants did not have to take the stand, but he then inquired "why didn't they have some witness to say where they were" on the night in question. At this point there was a warning from the court that counsel should not comment further about defendant's not taking the stand. But as he continued, the prosecutor stated (9 Cal.3d at p. 474): ". . . 'And ladies and gentlemen, there is no evidence whatsoever to contradict the fact that Mrs. Rubio [Campio] saw Mr. Vargas and Mr. Medina over Mr. Olness. *And there is no denial at all that they were there.* The defendants are guilty beyond any reasonable doubt . . . .' "

Defense counsel objected to this comment, claiming that it justified a mistrial; however, when the court asked if a strong admonition to the jury would satisfy them, counsel agreed to withdraw the motion for mistrial. Despite this, defendant Vargas argued on appeal that a *Griffin* error, requiring reversal, had occurred. All the court's comments on what constitutes *Griffin* error are pertinent. It said (9 Cal.3d at pp. 475-476): "Under the rule in *Griffin* v. *California, supra,* 380 U.S. 609, error is committed whenever the prosecutor or the court comments upon defendant's failure to testify. (See *People* v. *Modesto,* 66 Cal.2d 695, 710-711 [59 Cal.Rptr. 124, 427 P.2d 788].) However, not every comment upon defendant's failure to present a defense constitutes *Griffin* error. It is now well established that although *Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, that rule 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. [Citations.]' *(People* v. *Burns,* 270 Cal.App.2d 238, 247 [75 Cal.Rptr. 688]; accord, *People* v. *Smith,* 22 Cal.App.3d 25, 32-33 [99 Cal.Rptr. 171]; *People* v. *Bethea,* 18 Cal.App.3d 930, 936 [96 Cal.Rptr. 229]; *People* v. *Chandler,* 17 Cal. App.3d 798, 805-806 [95 Cal.Rptr. 146]; *People* v. *Grant,* 268 Cal.App. 2d 470, 475 [74 Cal.Rptr. 111].) For example, in *Bethea* (p. 936), the prosecutor made a closing argument which summarized the evidence against defendant and commented that ' "[t]he state of the record is that *there has been no explanation* given for this [the People's evidence of guilt. . . ." ' (Italics added.) The court held that '[t]here is absolutely no reference to the fact that defendant did not take the stand; nor is the remark susceptible of such interpretation by inference or innuendo.' [Fn. omitted.]

"At first glance, the words in *Bethea* appear substantially identical to the words at issue herein, namely, 'there is no denial at all that they were there [robbing Mr. Olness].' Yet we believe that, although the question is close, the *Bethea* case is distinguishable. In the present case, the word 'denial' connotes a personal response by the accused himself. Any witness could 'explain' the facts, but only defendant himself could 'deny' his presence at the crime scene. Accordingly, the jury could have interpreted the prosecutor's remarks as commenting upon defendant's failure to take the stand and deny his guilt.

"Other cases in this area confirm our analysis. In *People* v. *Gioviannini,* 260 Cal.App.2d 597, 604-605 [67 Cal.Rptr. 303], the court found *Griffin* error when the prosecutor commented upon defendant's alleged admission to a police officer, stating that ' "[t]he defendant, in his own words spoken to Sergeant Wrona, there is no denial of those words, *with the defendant present;* . . ." ' (Italics added by the court.) Similarly, in *People* v. *Northern,* 256 Cal.App.2d 28, 30-31 [64 Cal.Rptr. 15], the court found *Griffin* error in the prosecutor's statement that the People's evidence 'has not been refuted by the Defendant . . . .' (See also *People* v. *Modesto, supra,* 66 Cal.2d 695, 711 [prosecutor's comment that defendant knows the facts, and is sitting in the courtroom, 'and just sitting.']; *People* v. *Ham,* 7 Cal.App.3d 768, 778-779 [86 Cal.Rptr. 906] [trial judge commented that defendant was in the best position to explain certain facts]; *People* v. *Crawford,* 253 Cal.App.2d 524, 535-536 [61 Cal.Rptr. 472] [prosecutor's comment that ' "[t]he only thing we have heard from the defendant is this roundabout story from these relatives" '].)

"It is quite possible that the prosecutor in this case only intended to point out to the jury that the defense had introduced no evidence to show that defendant or Medina were elsewhere during the robbery. Yet the language used by the prosecutor was sufficiently ambiguous in this respect to lead us to conclude that *Griffin* error was committed. . . ."

Judged by this standard, it is obvious that the prosecutor stepped over the bounds of proper comment upon the defendants' failure to present a defense. If reference to a lack of a " 'denial' connotes a personal response by the accused himself," so also does the claim that the testimony was "unrefuted." Indeed, one of the examples given of an equivalent comment in the court's opinion in *Vargas* is that involved in *People* v. *Northern, supra,* 256 Cal.App.2d 28, 30-31, where the prosecutor stated "that the People's evidence 'has not been refuted by the Defendant.' " Moreover, in the present case any ambiguity in this respect was removed by the prosecutor's earlier remark that there were "five people up there on this

thing," and only three of them testified; he left no doubt as to who might have refuted the witnesses' testimony.

There remains the problem of ascertaining whether the error was prejudicial within the rule of *Chapman* v. *California, supra,* 386 U.S. 18. In this respect, as well, it is only necessary to consider the discussion of that aspect of the matter in *Vargas.* There the court noted that there are two elements bearing upon the determination whether the error "was harmless beyond a reasonable doubt." The first of these elements is the seriousness of the *Griffin* error. The second element is the impact of the error upon the jury's consideration of the evidence in light of the strength of the case against the defendant. The court's comments in these regards were as follows (9 Cal.3d at pp. 478-481): "The applicable test for determining whether an error which violates federal constitutional principles is reversible error is set forth in *Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], wherein the court held that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' This determination 'must be based on our own reading of the record and on what seems to us to have been the probable impact of the . . . [errors] on the minds of an average jury.' (*Harrington* v. *California,* 395 U.S. 250, 254 [23 L.Ed.2d 284, 287-288, 89 S.Ct. 1726].)

"First of all, apart from the state of the evidence in this case, we note that the type of *Griffin* errors involved here are of a much less direct, and accordingly much less serious, nature than the *Griffin* errors present in most of the cases which have found such error prejudicial and grounds for reversal. For example, in *Griffin* itself, the prosecutor *and* the court had directly informed the jury that, in appraising defendant's guilt, it could take into consideration defendant's failure to testify. Similar error was committed in *Chapman* v. *California, supra,* 386 U.S. 18, *In re Banks,* 4 Cal.3d 337, 348-349 [93 Cal.Rptr. 591, 482 P.2d 215], and *People* v. *Haston,* 69 Cal.2d 233, 254-255 [70 Cal.Rptr. 419, 444 P.2d 91].

"Thus, this court has noted that in determining whether prejudicial *Griffin* error has occurred, 'we must focus upon *the extent to which the comment itself might have increased the jury's inclination to treat the defendant's silence as an indication of his guilt.* The risk that a comment will have this effect may become considerable if either the court [fn. omitted] or the prosecution [fn. omitted] "solemnizes the silence of the accused into evidence against him" . . . by telling the jury "that from the failure of [the defendant] to testify . . . the inferences from the facts in evidence [should] be drawn in favor of the State." . . . A forbidden

comment, however, is less likely to affect the "substantial rights" of a defendant . . . if that comment merely *notes* the defendant's silence and includes no suggestion that, among the various inferences which might be drawn therefrom, those unfavorable to the defendant are the more probable. As the court pointed out in *Griffin*, absent such a suggestion "the inference of guilt is not always so natural or irresistible." . . . We do not mean to imply that a prohibited comment is necessarily or even ordinarily harmless so long as it is unaccompanied by a statement that silence implies guilt; we simply note that the absence of any such statement tends to mitigate the independently damaging effect of a comment uttered in violation of the *Griffin* rule.' (Italics in original; *People* v. *Modesto*, 66 Cal.2d 695, 713 [59 Cal.Rptr. 124, 427 P.2d 788].)

"In *Modesto, supra,* the prosecutor committed error in pointing out to the jury that the defendant, who knew the facts, was sitting in the courtroom, 'and just sitting.' Neither the prosecutor nor the court in its instructions told the jury that an inference of guilt might be drawn from defendant's silence. In finding harmless error only, we stated, 'Thus we do not deal here with what the *Chapman* court characterized as "a machine-gun repetition of a denial of constitutional rights, all designed and calculated to make [defendant's] version of the evidence worthless. . . ." ' (66 Cal.2d at p. 714.)

"We made a similar observation in *People* v. *Morse*, 70 Cal.2d 711 [76 Cal.Rptr. 391, 452 P.2d 607], wherein the prosecutor commented upon defendant's silence and the court instructed the jury that an unfavorable inference could be drawn against defendant for his failure to deny or explain prosecution evidence. We noted in *Morse* that the prosecutor's comment 'was brief and mild and not uttered with "machine-gun repetition" and devastating effect as in *Chapman*.' (P. 730.) Moreover, in context, the court's instruction, though erroneous, was of minimal significance. (*Id.*)

"As in the *Modesto* and *Morse* cases, the prosecutor's remark here ('There is no denial at all that they were there') was brief and mild, and amounted to no more than an indirect comment upon defendant's failure to testify without suggesting that an inference of guilt should be drawn therefrom. . . .

"The cases which have considered the prejudicial effect of errors similar to those committed in the instant case almost uniformly have found those errors to be harmless. (See *People* v. *Morse, supra,* 70 Cal.2d 711, 729-730; *People* v. *Modesto, supra,* 66 Cal.2d 695, 712-714; *People* v. *Ross,*

67 Cal.2d 64, 73 [60 Cal.Rptr. 254, 429 P.2d 606]; *People* v. *Townsend, supra,* 20 Cal.App.3d 919, 925 [98 Cal.Rptr. 8] [CALJIC No. 2.61]; *People* v. *Ham, supra,* 7 Cal.App.3d 768, 784; *People* v. *Burns, supra,* 270 Cal.App.2d 238, 249; *People* v. *Gioviannini, supra,* 260 Cal.App.2d 597, 604-605; *People* v. *Northern, supra,* 256 Cal.App.2d 28, 30-31; *People* v. *Crawford, supra,* 253 Cal.App.2d 524, 535-536.) The one exception appears to be *People* v. *Williams, supra,* 22 Cal.App.3d 34, 46 [99 Cal.Rptr. 103], wherein (as here) indirect prosecution comment upon defendant's failure to testify was combined with the giving of CALJIC No. 2.61. In *Williams,* however, the *Griffin* error was aggravated by 'a breakdown in legal representation [by defense counsel] which substantially reduced the strength of defendant's claim of total diminished capacity' (p. 50), together with *three* erroneous instructions regarding intent, insanity and unconsciousness.

"Moreover, in *Williams* (as in all of the decisions we have reviewed which reversed convictions for *Griffin* error), 'the decision [as to defendant's guilt] was a close one.' (P. 39; see p. 46, fn. 11.) Accordingly, the court could not say beyond a reasonable doubt that the combination of errors committed in that case was harmless. (P. 58.) In the instant case, however, the case against defendant was overwhelming: The defense presented no alibi witnesses or other exculpatory evidence, and defendant was positively identified as one of the robbers by the victim and an eyewitness. The victim, Mr. Olness, was evidently quite confused regarding the time and circumstances of the robbery, yet he remained unshaken regarding his identification of defendant. Miss Campio was even more positive that defendant was one of the robbers, for she actually had *known* defendant ('Pete') for some time prior to the incident. Her prior acquaintance with defendant made wholly irrelevant her apparent error in believing that defendant had been frequenting the La Paloma restaurant during the ten days prior to the robbery.

"This court has stated that, in order for *Griffin* error to be prejudicial, the improper comment or instruction must either 'serve to fill an evidentiary gap in the prosecution's case,' or 'at least touch a live nerve in the defense, . . .' (*People* v. *Modesto, supra,* 66 Cal.2d 695, 714; see *People* v. *Morse, supra,* 70 Cal.2d 711, 730.) In the instant case, the errors complained of could not conceivably have served either function. (See also harmless error cases, *supra,* pp. 479-480, many of which emphasize the failure of the defendant to present a credible, or any, defense.) We conclude that, on the basis of the record before us, the *Griffin* errors

at issue could have had no significant impact upon the jurors and were harmless beyond a reasonable doubt." [Fns. omitted.]

So far as the first element is concerned, it would appear that the *Griffin* error was not of the "minimal" type which is "no more than an indirect comment upon defendant's failure to testify without suggesting that an inference of guilt should be drawn therefrom." What the prosecutor did was ask the jury to believe the three accomplice witnesses because the defendants could and should have refuted their testimony by explaining what happened, if what the witnesses had testified to was not true. On the other hand, there was no "machine-gun repetition" of the comment. We conclude that it was a relatively serious *Griffin* error which increased the likelihood of the jurors indulging their natural tendency to make the inference that the prosecutor urged them to make.

Consideration must also be given to whether the comment would "serve to fill an evidentiary gap in the prosecution's case." In this respect, at least, the answer is clear. The only gap there was in the prosecution's case was the fact that the principal prosecution witnesses were accomplices and, for various other reasons, were of dubious credibility. Their status as accomplices has already been pointed out. ■ The testimony of any accomplice, as the jury was instructed, must be "viewed with distrust." (CALJIC No. 3.18; *People v. Barclay,* 40 Cal.2d 146, 153 [252 P.2d 321]; *People v. Gonzales,* 4 Cal.App.3d 593, 607 [84 Cal.Rptr. 863].) ■ Moreover, these accomplices had been granted immunity in connection with their agreeing to testify against defendants. Wholly apart from the invalid condition attached thereto, the immunity orders further diminished the weight of their testimony. (*People v. Brunner, supra,* 32 Cal.App.3d 908, 915.) In addition, each of them had consumed large quantities of barbiturates on the day of the murders,[5] which impaired to some degree their ability to perceive and to recall. Finally, each of the three accomplice witnesses admitted lying at one stage or another of the investigation or proceedings relating to these crimes.

Add to all of the above the fact that the jury took five days to reach a verdict, and it is apparent that the case against the defendants was not "overwhelming." Arguably, any case in which substantially all of the direct evidence against the defendants is the testimony of accomplices, which must be viewed with distrust, is a close case. This one was especially close in view of the many other factors which called into question the credibility of these witnesses.

---

[5]According to the testimony of Gleitsman, she had consumed eight "yellows" before the events occurred which resulted in the victims' deaths.

Accordingly, we are unable to say that the *Griffin* error was harmless. The judgment must, therefore, be reversed on this ground as well.

### A Retrial of the Matter Is Appropriate

It does not appear that the above errors preclude the retrial of defendants. However, serious problems created by the existence of the accomplice testimony given pursuant to the immunity orders require consideration at this time. In addition, defendants have challenged the sufficiency of the evidence to corroborate the accomplices' testimony. Since a lack of sufficient corroboration would have required the granting of defendants' motion to acquit, thereby precluding retrial, it is necessary to discuss this contention as well. The following observations are made for the guidance of the trial court upon retrial of the matter and to dispose of defendants' claim that they are entitled to an acquittal.

### The Immunity Orders

The immunity orders can be modified by a unilateral stipulation in behalf of the People, since the elimination of the condition would be beneficial to the witness in each case. Before any of the three prosecution witnesses above referred to (Vaughn, Gleitsman and Walton) shall be permitted to give further testimony, the orders granting them immunity shall be modified by striking therefrom the above quoted conditions. If such conditions are stricken and the witnesses give further testimony pursuant to the immunity orders, provision must be made to free the witnesses of any possible prejudice as a result of the testimony already given. To that end it is ordered that their testimony heretofore given under the effect of such orders shall not be admissible against them in any future proceeding, either to prove any conduct on their part or to establish perjury.

To fully protect defendants, it is also necessary to ensure that the testimony heretofore given by these witnesses under the effect of these orders shall not be used against them. This requires that such testimony shall be inadmissible against defendants, either as direct testimony or as evidence to contradict or impeach the witnesses' future testimony. The only exception to this shall be that if defendants choose to use any part of it, such further portion as is reasonably necessary to explain the portion used shall be admissible.

### Defendants' Motions to Acquit Were Properly Denied

Motions to acquit were made by both defendants at the conclusion of the prosecution's case. These motions were based upon defendants' con-

tention that the witnesses Vaughn, Gleitsman and Walton were each accomplices as a matter of law and that the evidence offered to corroborate them was insufficient to meet the requirement of Penal Code section 1111.[6]

We have already held that the prosecution's three principal witnesses were accomplices. The evidence introduced by the prosecution through nonaccomplice witnesses was, however, sufficient to corroborate them.

The testimony of the corroborating witnesses set forth in the statement of facts showed clearly that the defendants were in the company of the three accomplices in defendant Medina's truck a few hours before and shortly after the murders were committed. Furthermore, the truck was placed at the remote site which was the scene of the murders by the testimony of the young motorcyclist. The presence of both defendants at the scene of the crime was thus amply supported; in fact, counsel for defendant Medina in his opening statement to the jury conceded this, and counsel for defendant Townsend concurred.[7]

In addition to the evidence of their presence at the scene of the murders, defendants were both shown to have kept knives in their immediate possession. The early morning episode involving Kim Bertsch and her father was probative of this,[8] and defendant Townsend's hunting knife was observed on his person by two corroborating witnesses during the early stages of the fatal excursion. The autopsy surgeon testified that two knives inflicted the mortal wounds and that one of them corresponded to defendant Medina's double-edged dagger and the other corresponded to defendant

[6]Penal Code section 1111 provides, in part, as follows: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

[7]Counsel for defendant Medina stated as follows: "I think the evidence will show that—I think it already has—that he was present at this location."

Counsel for defendant Townsend indicated concurrence with this view when he said: "Ladies and Gentlemen, as Mr. Kenner has indicated, there are certain things we do not expect the defense to have any quarrel with."

[8]The legitimate objective of the testimony relating to this incident was proof that defendants kept knives in their immediate possession, not (a) that they had a disposition for assaultive behavior with those knives, nor (b) that the knives were of a character capable of being employed as weapons. Prior acts of misconduct on the part of defendants were inadmissible for the former purpose under Evidence Code section 1101, and there was no dispute as to the usefulness of the knives for the purpose of stabbing someone. The circumstances leading up to this incident (that Cornelia Todd, age 11, and Kim Bertsch, age 14, had spent the night in defendants' beds) were highly prejudicial to defendants. In any retrial of the matter, care should be taken to restrict the evidence to that which the probative value of is not outweighed by the prejudice to defendants. (Evid. Code, § 352.)

Townsend's hunting knife. There was, therefore, substantial evidence showing that the murders were committed with weapons of the kinds kept in the immediate possession of the two defendants.

The testimony concerning defendant Townsend's arrest gave further support to the accomplices' testimony by indicating his consciousness of guilt.

■ It is not necessary that the testimony of an accomplice be corroborated as to every fact to which he testified. Rather, it is sufficient that the corroborative evidence tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth. Such evidence need not be sufficient in and of itself to establish every element of the offense charged; it may be slight and entitled to little consideration when standing alone. (*People* v. *Hathcock,* 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476]; *People* v. *Perry,* 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129].)

Though the evidence placing both defendants at the scene of the crime was not in and of itself sufficient corroboration (*People* v. *Robinson,* 61 Cal.2d 373, 398-400 [38 Cal.Rptr. 890, 392 P.2d 970]), such evidence was sufficient in combination with the evidence showing that defendants had in their immediate possession weapons corresponding to those used in the murders. In *People* v. *Henderson,* 34 Cal.2d 340, 345-346 [209 P.2d 785], the accomplice's testimony was held to be sufficiently corroborated by evidence of the defendant's presence at the scene with the accomplice and by proof that he had recently purchased a gun of the kind (a .410 shotgun) used in the robbery.

Defendant Medina's connection with the crimes was also corroborated by the young motorcyclist's testimony as to the presence of his truck at the time the murders were committed.

Defendant Townsend's connection with the crimes was further corroborated by the evidence concerning the circumstances of his arrest. As our Supreme Court said in *People* v. *Perry, supra,* 7 Cal.3d 756, 771: "[T]he flight of one who knows he is suspected of committing a crime may be sufficient to corroborate the testimony of an accomplice."

■ The combined effect of the corroborative evidence against each of the defendants was sufficient to justify the denial of their motions to acquit.

By reason of the constitutional errors above discussed, the judgments against defendants, and each of them, are reversed.

Cobey, Acting P. J., and Allport, J., concurred.

A petition for a rehearing was denied September 19, 1974, and respondent's petition for a hearing by the Supreme Court was denied October 30, 1974.