[No. B186285. Second Dist., Div. Eight. July 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GERARDO REYES, Defendant and Appellant.

## Counsel

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster, Michael R. Johnsen and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**COOPER, P. J.**—Gerardo Reyes appeals from the judgment imposed after a jury convicted him of first degree murder (Pen. Code, § 187; undesignated section references are to that code), and found that the murder was committed to prevent the victim from testifying (§ 190.2, subd. (a)(1)), and that appellant personally used a firearm (§ 12022.5, former subd. (a)(1)). Appellant was sentenced to a term of life without possibility of parole, plus four years. He contends that (1) the plea agreement of his codefendant, who testified against appellant, was coercive of that testimony and denied appellant due process and a fair trial; (2) the court erred in allowing an opinion regarding the credibility of a prosecution witness; and (3) appellant is entitled to pretrial custody conduct credits.

We conclude that there was no reversible error at trial, but that appellant is entitled to the pretrial conduct credits he claims. We modify the judgment to grant those credits, and affirm the judgment as so modified.

## FACTS

Appellant was convicted at a third trial, during which his codefendant, George Vidales, pled guilty and testified against him. The juries in the first two trials had hung, and the first had acquitted another codefendant. As shown by the evidence, the murder had occurred in the context of the Mexican Mafia, a prison gang that dominated Hispanic street gangs, principally by enforcing the payment of "taxes," or exactions from narcotics sales and other criminal activity. The Avenues gang in Northeast Los Angeles was involved with the Mexican Mafia, and the Avenues' membership included actual mafia members, and also associates and subordinate soldiers, which included appellant and Vidales.

A known rule of the Mexican Mafia was that cooperation with law enforcement was punishable by death. The penalty was not imposed, however, without documentation verifying the violation, referred to as paperwork.

In August 1995, Los Angeles police investigated the murder of two brothers, members of the Highland Park gang. Officers spoke to Randy Morales, an Avenues member who was in juvenile hall. He told them that Javier Marquez, another Avenues member, for whom he worked and who also was a Mexican Mafia associate and near-member, had shot the brothers and other members of Highland Park. A copy of the interview report became part of the "murder book," of which Marquez's prosecutor received two copies, one for defense counsel. The prosecutor did not redact Morales's name, because redaction had already been made. The book was turned over to the defense about April 1996. The references to Morales remaining in it sufficed as paperwork.

Morales, then age 16, was killed on the night of October 5, 1996. At his request, a woman friend dropped him off at Drew Street, a prominent Avenues location, near which he attended a party. According to Vidales's testimony, at the party appellant and Carlos Caldera, another Avenues-Mexican Mafia individual, approached Vidales. Caldera asked Vidales for a favor, and explained about the paperwork and that Marquez wanted Morales killed, before he could testify against him. Caldera stated that appellant would be

taking care of it. Appellant confirmed this, but stated he wanted to do it away from Drew Street. Caldera suggested that Vidales speak to Morales about a .25-caliber handgun Vidales had borrowed and Morales wanted back, and tell him that they would drive with appellant and Caldera to Vidales's house to get it. Vidales actually had the gun with him, and Caldera told him to give it to appellant, which he did.

Morales approached Vidales and asked about the gun, and Vidales told him the prescribed story. Morales said he would go with them. Vidales reported this to appellant and Caldera, and appellant said he would get his girlfriend's van. He did so, but told the group he first had to get some food for her. Morales and Vidales accompanied him.[1] When they returned to where Caldera was, appellant left for his girlfriend's, and Caldera informed Vidales that in the interim he had encountered Marvin Ponce, another Avenues member. Caldera had told Ponce what was impending, and Ponce would accompany them.

When appellant returned, he told Vidales to drive. Appellant sat in the passenger seat, with Caldera, Ponce, and Morales in the back of the van. Vidales drove through back streets to a secluded one, where he stopped and announced he had to urinate. He left the van and did so. Vidales then saw Morales, crouched down outside the van, and appellant approaching him. Using Vidales's gun, appellant shot Morales in the top of the head, then came closer and shot him several more times. Appellant and Vidales resumed their seats in the van, and Vidales drove to his nearby apartment, where appellant wrapped up the gun and put it in the building's dumpster. The group then returned to Drew Street.

Morales's body was found by a paramedic at about 11:30 p.m., shortly after a neighbor heard shots and saw a van carrying four Hispanic men drive away. At the scene, Los Angeles Police Detective Peterson recovered six cartridge casings and two expended bullets from the body's vicinity. Three more bullets were extracted at the victim's autopsy. The detective opined that the murder weapon was a .25-caliber semiautomatic handgun, while a firearms analyst found all casings and bullets respectively had been discharged from a single gun.

The autopsy disclosed that Morales had suffered five fatal head wounds, and a potentially fatal one in the mouth. The quantity was consistent with a

---

[1] During this ride, Vidales spoke with witness No. 1 (described below), telling him that Morales was going to be "checked," or disciplined, because of paperwork. Witness No. 1 advised him not to participate, because gang leader Richard Aguirre was close to Morales, and would become angry if he were killed.

Mexican Mafia killing, and the shot to the mouth signified that the victim was one who had talked too much.

Further testimony regarding appellant's complicity came from witness No. 1, whose name (along with several others) the court redacted from the record. An Avenues member and a Mexican Mafia associate, witness No. 1 had been convicted of several offenses before his 1999 indictment on federal charges. Facing a sentence of two life terms, he agreed to plead guilty and cooperate with federal and state authorities, in exchange for a 42-month sentence, immunity for numerous crimes, and relocation. Witness No. 1's informational and testimonial obligations included this case.

Witness No. 1 recounted his encounter with Vidales the night of the shooting. (See *ante*, fn. 1.) The next day, witness No. 1 learned at Richard Aguirre's home that Morales had been killed. Soon witness No. 1 spoke to Vidales, who claimed he had not known Morales was going to be killed. Witness No. 1 then spoke to appellant, on Drew Street. During their meeting, appellant kept his hand on a gun in his back waistband. Witness No. 1 told him he knew appellant had killed Morales, and appellant admitted he had. He said Morales was a "rata" and had to go, and that the order had come from Marquez.

In his defense, appellant called several witnesses who contradicted various aspects of Vidales's account of the events. Among them was witness No. 2, a former Avenues member and Mexican Mafia tax collector who had cooperated with the prosecution, and whom it had called at appellant's first two trials, but not at this one. In prior testimony that was read after he invoked his privilege against self-incrimination, witness No. 2 recounted different aspects of the offense that either Vidales had told him, or that he had witnessed when, he claimed, he was originally solicited to be part of the group to kill Morales. For example, witness No. 2 testified that Vidales had told him that only appellant, Vidales, and Morales had driven to the scene of the shooting, and that Morales had been lured there by being told they were going to another party.

In rebuttal, Vidales adhered to several contradicted elements of his account. The prosecution also read part of witness No. 2's former testimony, particularly concerning how he had left gang activity after becoming threatened and targeted.

## DISCUSSION

### 1. *Vidales's Plea Agreement.*

Appellant contends that a portion of Vidales's plea agreement rendered his testimony improper, and its admission a deprivation of due process. We first review the context and content of the agreement.

Facing a special circumstance sentence if convicted, Vidales approached the prosecution team after the end of the second trial, in 2004. He had three meetings with Los Angeles police detectives. The first did not involve discussion of the facts of the case, but the second and third did. In the second interview, Vidales consistently attributed the murder to appellant. But he also either misstated or understated the truth in several respects, significantly omitting to name Caldera and Ponce as participants. Vidales corrected that omission in his third interview, which the prosecution understood to be truthful and inclusive.[2]

The prosecution nevertheless began the third trial with Vidales still a defendant. However, after witness No. 1 testified, the prosecutor informed the court that because of witness No. 1's poor demeanor on the stand, the prosecution had reached an agreement with Vidales, whom they perceived as less culpable than appellant, to permit Vidales to testify.

Vidales's plea agreement provided, in essence, that he would testify truthfully and completely at any proceedings concerning Morales's death. In that connection he also would plead guilty to second degree murder. But if he performed all his obligations under the agreement, then after the last proceeding at which he was called to testify, the prosecution would join in a motion to withdraw the plea, and instead enter a plea to manslaughter, for which Vidales would receive a six-year midterm sentence. On the other hand, he would be bound to a 15-year-to-life sentence if he failed to perform all his obligations, and if he were in violation he could not withdraw his plea without court consent. Vidales would also receive immunity for past crimes, but not including the killing of Morales, or perjury or future crimes.

Near the end of the agreement was the provision about which appellant complains. As recited by the prosecutor in court, without the jury present,[3] it

---

[2] Vidales's naming of Ponce and Caldera provided the prosecution with two further potential subjects of prosecution for the murder.

[3] When Vidales later testified before the jury about the agreement, this provision was not mentioned.

stated: "If we discover that you did not tell us the truth already, that you have already not told us the truth about a material significant matter in your . . . third interview at NCCF conducted by Detective[s] . . . you will be in breach of this agreement and will be sentenced to 15 years to life in prison on your plea today of second degree murder." (Hereafter the interview provision.) Vidales acknowledged that he understood this.

■    Appellant's challenge to the interview provision, to Vidales's testimony, and ultimately to his conviction, derives from doctrine that originated in *People v. Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133] (*Medina*). In that case, accomplices to two murders testified for the prosecution under orders granting them immunity on condition they not "materially or substantially change" their testimony from previous police interviews. (*Id.* at p. 450.) The Court of Appeal ruled that these orders engendered constitutional error, as follows: "[A] defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." (*Id.* at p. 455.)

The Supreme Court has reiterated this language, and has proceeded to explain, "Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citing *Medina*], or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial. On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid. [Citations.]" (*People v. Allen* (1986) 42 Cal.3d 1222, 1251–1252 [232 Cal.Rptr. 849, 729 P.2d 115], fn. omitted (*Allen*).)

■    Appellant contends that the interview provision violated these strictures, because it placed Vidales under a strong compulsion to testify in accordance with his interview. Before examining this contention, we confront respondent's position that appellant has waived it, by not asserting it in the trial court. Several Supreme Court cases have held that failure to challenge at trial testimony under a plea agreement, by objection, motion, or otherwise, waives the claim for appellate purposes. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 489 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Riel* (2000) 22 Cal.4th 1153, 1178–1179 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Sully* (1991) 53 Cal.3d 1195, 1216 [283 Cal.Rptr. 144, 812 P.2d 163].) However, all of these cases proceeded to weigh the merits of the objection, sometimes in

response to a present claim of ineffectiveness of counsel in failing to object. We deem that appropriate here as well. Appellant has declared his intention to assert a postconviction ineffective assistance claim. We decide the present issue to forestall that further claim. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27 [44 Cal.Rptr.2d 796].)

Turning to the merits, the language of Vidales's plea agreement significantly contrasts with the type of provision found improper in *Medina, supra,* 41 Cal.App.3d 438, and so characterized in *Allen, supra,* 42 Cal.3d at pages 1251–1252. With respect to Vidales's testimony at appellant's trial, the agreement included the following provision: "You agree that you will testify truthfully and completely at any and all proceedings including trials arising out of the death of Randy Morales." Unlike the situation in *Medina,* the later interview provision did not impose a further qualification on the content of Vidales's testimony. Rather, the interview provision was a separate condition of Vidales's plea bargain, that he had already told the prosecution the truth, in his ultimate interview.

Thus, by its terms the interview provision did not qualify or restrict Vidales's agreement to testify truthfully, nor did it direct that he testify in conformity with his interview. Under our Supreme Court's decisions on claims of "*Medina* error," these are critical, dispositive distinctions. Appellant's position is that even though the interview provision did not direct Vidales's testimony, its threat to undo his plea bargain, if his third interview were found to have been materially untruthful, effectively coerced him to testify in accordance with the interview. This claim is hypothetical and unverifiable. Practically, it is far more likely that Vidales entered into the interview provision because he, like the prosecution, believed his interview was truthful. If that is so, the provision posed no improper compulsion. (See *People v. Fields* (1983) 35 Cal.3d 329, 361 [197 Cal.Rptr. 803, 673 P.2d 680].)

Second, as a legal matter, appellant's claim is at odds with the Supreme Court's views. As appellant himself acknowledges, "The California Supreme Court has refused to extend *Medina* beyond the instance in which a plea agreement expressly requires consistency between accomplice testimony and a prior statement." The court so held in *People v. Garrison* (1989) 47 Cal.3d 746, 771 [254 Cal.Rptr. 257, 765 P.2d 419] (*Garrison*), as follows: "[U]nless the bargain is expressly contingent on the witness sticking to a particular version, the principles of *Medina* [citation] and [citation] are not violated." The court reiterated this language—with emphasis on the words "*expressly*

*contingent*"—in its most recent decision on the subject. (*People v. Boyer* (2006) 38 Cal.4th 412, 456 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*).)

*Garrison, supra,* 47 Cal.3d 746, not only announced this governing rule, but did so when rejecting a challenge to a plea agreement extremely similar to Vidales's. In *Garrison,* an accomplice entered a plea agreement that provided he would testify truthfully against the appellant at trial. As recited by the prosecutor, " '[A] *further part of this plea agreement*' " was that the witness " '*has already truthfully stated to the investigating detectives what happened in this case.*' " (*Id.* at p. 768, original italics.) The appellant argued that this provision effectively, and unconstitutionally, bound the witness to testify in accordance with his police statement. (*Id.* at p. 770.)

The Supreme Court disagreed. It explained: "[The witness] was never told that he had to testify to the same story he had already told police and he never agreed to so testify. Nor was he told that the deal would be off if his trial testimony differed from the prior story. It is apparent that the district attorney *expected* [the witness] to testify to the same story at trial. It is a rare case indeed in which the prosecutor does not discuss the witness's testimony with him beforehand and is assured that it is the truth. However, unless the bargain is expressly contingent on the witness sticking to a particular version, the principles of *Medina* . . . are not violated." (*Garrison, supra,* 47 Cal.3d at p. 771.) Thus, what the Supreme Court considers forbidden is an express agreement to testify in accordance with a prior statement or version, not simply an undertaking as to the truth of the prior statement. Under *Garrison*'s rule and analysis, the interview provision cannot be deemed invalid.[4]

A coordinate principle of the Supreme Court's *Medina* jurisprudence is the understanding, quoted above from *Allen, supra,* 42 Cal.3d at pages 1251–1252, that although plea agreements calling for testimony naturally will exert some compulsion to testify satisfactorily, an agreement that binds the witness only to testify truthfully, and not in a prearranged fashion, cannot be deemed invalid.

*Boyer, supra,* 38 Cal.4th 412, exemplifies operation of this principle. There two witnesses were granted immunity, on condition and agreement that they testify truthfully (or be subject to perjury prosecution). The agreements also recited that the witnesses had represented that their testimony would be

---

[4] The interview provision did not provide "that the deal would be off if [Vidales's] trial testimony differed from the prior story." (*Garrison, supra,* 47 Cal.3d at p. 771.) Rather, it provided that the bargain would be breached if the prosecution discovered Vidales had been significantly untruthful in his third interview.

consistent with specific recorded statements made to the police. (*Id.* at pp. 455, 457.) Rejecting the contention that the witnesses' testimony had been coerced to follow the prior statements, the court stressed that the witnesses were expressly obligated only to testify in accordance with the truth. The portions of the immunity agreements reciting expectations that their testimony would accord with their prior statements reflected the witnesses' and the prosecution's understanding that those statements had been truthful. But there was no agreement requiring the witnesses to reiterate the statements regardless of their truth, and therefore the testimony had been proper. (*Id.* at pp. 456–457; cf. *People v. Fields, supra,* 35 Cal.3d at pp. 359–361.)

■ Once more, the same is true here. Because the interview provision did not require that Vidales testify in accordance with his interview, and the plea agreement as a whole required only that he testify truthfully, the agreement did not deny appellant a fair trial.

### 2. *Testimony About Witness No. 1's Disclosures.*

Appellant assigns error in the court's allowing a police witness to testify that witness No. 1 had provided information critical to the solution of five murder cases, including Morales's. We conclude that the testimony was properly admitted, and in any event its admission was not prejudicial.

As previously noted, witness No. 1's immunity agreement provided that he would share information with law enforcement, and testify, regarding various crimes. Witness No. 1 recounted that he had provided the Los Angeles County District Attorney's office with information about Morales's murder and several others, and had testified for the prosecution in other murder trials.

Subsequently, the prosecution called Los Angeles Police Detective John Berdin, who stated he had originally interviewed witness No. 1, and had assigned officers to handle murder investigations prompted by the witness's information. When Berdin was asked which detectives he assigned, appellant's counsel objected. At the bench, counsel stated that testimony about other investigations was irrelevant, as well as inflammatory, and that those conditions would increase if the detective testified regarding other trials, and as to convictions or acquittals. The court responded that it would exclude convictions and acquittals, because they involved others' opinions, but that witness No. 1's performance of his immunity agreement was relevant and admissible. The court explained, "It goes to his credibility. It goes to what he was doing for the police."

The prosecutor then asked Detective Berdin, "Was [witness No. 1]'s information critical to the solution of any murder investigations?" Appellant

objected, as irrelevant, and the court overruled, stating ". . . I believe the fact that he was a witness, what he did. He can offer an opinion as to—." Appellant's counsel added that he objected to the form of the question, and the court again overruled. Berdin then answered yes, and further testified there had been five such investigations, including the Morales murder.

■ Appellant contends that Berdin's testimony about the importance of witness No. 1's information constituted an inadmissible opinion about witness No. 1's credibility as a witness. (See *People v. Melton* (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39–40 [187 Cal.Rptr. 497].) Apart from the fact that this was not the basis of appellant's trial objection, the contention lacks merit because the detective did not offer or state an opinion about the witness's credibility. Assuming the characterization of witness No. 1's information as "critical" constituted opinion testimony, it concerned the murder investigations, and Detective Berdin was entitled, as a professional who had overseen them, to give such an opinion. The testimony was relevant and admissible, not as an opinion about witness No. 1's credibility, but as evidence of conduct supporting it. (See *People v. Harris* (1989) 47 Cal.3d 1047, 1080–1082 [255 Cal.Rptr. 352, 767 P.2d 619] [evidence of informant-witness's prior reliability properly admissible].)

Even if it had been improper, admission of Detective Berdin's testimony would not have been prejudicial error. The jury heard further, substantial testimony about witness No. 1's having assisted with several prosecutions. Detective Berdin's one-word appraisal of such assistance did not materially expand that testimony. Appellant's argument that, viewed as an opinion, the detective's statement was crucial to witness No. 1's credibility is unrealistic. And appellant's prior mistrials did not include Vidales's eyewitness accomplice testimony. No more favorable result would have occurred had Berdin's remarks been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 3. *Presentence Conduct Credit.*

■ Appellant's final contention, that he was improperly denied conduct credit for his time in presentence custody, is valid. Respondent agrees with appellant that because the murder occurred on October 5, 1996, it was not subject to section 2933.2, effective June 3, 1998, which thereafter deprived murder defendants of presentence conduct credits. Rather, appellant was entitled to credits of 15 percent of his presentence custody, under section 2933.1, subdivision (a). Based on appellant's 1,560 days actual custody, the number of days of conduct credit is 234. We shall modify the judgment to allow them.

## DISPOSITION

The judgment is modified to provide for presentence custody credit of 1,794 days, comprising 1,560 days actual custody and 234 days conduct credit. As modified, the judgment is affirmed. The trial court shall send an amended abstract of judgment to the appropriate authorities.

Rubin, J., and Flier, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 12, 2008, S166519.