Filed 1/22/16  P. v. Chamberlain CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066706 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD253743) |
| SHAUN CHAMBERLAIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura H. Parsky, Judge.  Judgment reversed; convictions affirmed in part, reversed in part; remanded for further proceedings.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendant Shaun Chamberlain appeals from a judgment of conviction after a jury convicted him of four felony counts, and corresponding enhancements, related to his theft of more than $700,000 from his former employer.

On appeal, Chamberlain contends (1) that pursuant to the authority of *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), he should stand convicted of only a single theft-related offense, rather than all four of the offenses of which he was convicted, because, he argues, all of his offenses were committed pursuant to the same overall scheme or plan; (2) that the prosecution committed misconduct in making certain statements that Chamberlain maintains constituted indirect comments on Chamberlain's failure to testify and amounted to constitutionally-prohibited burden-shifting; and (3) that the trial court erred in instructing the jury on the elements of Penal Code[1] section 471, requiring reversal of that count, and the vacating of certain sentencing enhancements.

We reject Chamberlain's first two contentions. However, the People concede, and we agree, that Chamberlain's conviction on count 3, which charged him with violating section 471, must be reversed due to instructional error. Further, since the jury's true finding on the white collar crime sentencing enhancement under section

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

186.11, subdivision (b), was based in part on the jury's conviction of Chamberlain on count 3, the true finding on that enhancement must also be reversed.[2]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

During the 1990s, attorneys Francesco Simone and Chris Chatard opened a law practice. They specialized in landlord-tenant issues, evictions, contract disputes and business litigation. Simone and Chatard did most of the work themselves, but in the late 1990s, they hired Chamberlain and his company, Dependable Attorney Service, to handle process serving.

Sometime after 2000, Simone and Chatard dissolved their partnership, but continued to share office space. They also shared office space with Chamberlain's company. The three parties split the rent. Chamberlain continued to work for both attorneys, and was paid as an independent contractor.

When Chamberlain or employees of his company performed work for Simone, Chamberlain's company was paid by the hour and/or by the assignment. For example, Chamberlain's company was paid $20 per hour for work on general civil matters, but when Chamberlain worked on an unlawful detainer case, he was paid a flat rate of $50. Chamberlin would submit invoices for his services each month, and Simone would issue Chamberlain a check.

---

[2]    We decline to reverse the jury's true finding on two section 12022.6 enhancements, for reasons explained in part III.C.2, *post*.

3

In 2009, Chatard retired and Simone bought Chatard's business and began representing Chatard's clients. The extra business resulted in substantially more administrative work for Simone. Timely processing of the nearly 100 checks that had to be written each month became difficult for Simone to handle himself because he was often in court. Chamberlain began helping Simone with accounting, and suggested that Simone get a signature stamp that would allow Chamberlain to sign and process checks for Simone when Simone was unavailable. Simone trusted Chamberlain, and agreed to obtain a signature stamp.

In addition, Chamberlain managed Simone's law firm's bank accounts, including a trust account and a firm checking account, using QuickBooks. Simone gradually became less involved with the accounting for his firm. Eventually, Chamberlain took over the bookkeeping for the firm, inputting all of the data into QuickBooks and handling payroll for the firm. Chamberlain mailed out invoices, processed checks received from clients, deposited checks, opened mail and paid bills.

At some point, Chamberlain stopped submitting monthly invoices to Simone for his own work, and instead confirmed with Simone that he had paid himself. When Simone needed money, he would ask Chamberlain to issue him a check.

Between 2009 and 2012, Simone's firm expanded its business to handle loan modification cases. Clients seeking a loan modification would pay Simone's firm an up-front fee, and Simone assisted clients with completing the paperwork required for processing a loan modification. If the loan was ultimately modified, Simone would

4

keep the fee that the client had paid. If the loan modification request was denied, Simone's firm would refund the fee to the client.

Simone first began to suspect that something was amiss with his firm checking account in October or November 2011. Until that time, Simone had "tr[ied] to keep a running total of the money that was in the account." During that time frame, when Simone asked Chamberlain for checks as owner withdrawals, as he had done before, Chamberlain starting making excuses for why he would have to delay issuing Simone a check. Simone requested that Chamberlain stop using the signature stamp, so that Simone could try to "get a better gauge" on what money was coming into his firm and what was going out.

Simone admitted that up until that point, he had "turned a blind eye" to the accounting at his firm because he was busy with the legal work and he had some family matters that required his time. Simone "relied on [Chamberlain] to do things right."

Simone and his family left for a three-week vacation during the last week of December 2011. When Simone returned to the office, he asked Chamberlain to issue him a check for $15,000. Chamberlain told Simone that there were essentially no funds in the firm's account. A couple of weeks later, Simone again asked Chamberlain to issue him a check for $15,000. Chamberlain said that there were not enough funds to issue a check in that amount, but that he could issue Simone a check for $5,000. Simone did not understand why the account would not have sufficient funds to cover his $15,000 request because he was aware that the firm had recently received two large

5

cash settlements, and Simone had not withdrawn any money from the account for over a month.

At that point, Simone asked Chamberlain for the login information so that he could examine the account online. Initially, Chamberlain told Simone that he did not have the login information at the office, which made Simone suspicious. Simone knew that Chamberlain had to check the account frequently to determine when checks would clear. Simone did not understand why Chamberlain would not have the login information at the office. He told Chamberlain to go home and get it.

Once Chamberlain provided Simone with the login information for his account, Simone reviewed the transactions and saw that Chamberlain had issued checks totaling approximately $73,000 to himself and his own company during the three-week period that Simone had been on vacation with his family. Because Simone knew that Chamberlain's annual pay would amount to somewhere between $50,000 and $75,000, or possibly up to $90,000, Simone did not understand why Chamberlain would have issued checks to himself and his company for $73,000 in a three-week period.

Once Simone discovered this information, he believed that Chamberlain had been stealing from him. Simone immediately went to the bank and a bank employee assisted him in closing his current accounts and opening new accounts. That night, Simone arranged for someone to go onto Chamberlain's computer and copy all of the QuickBooks accounting data.

The following day, Simone confronted Chamberlain and asked him why he had withdrawn $73,000 while Simone was on vacation. Chamberlain responded that he had

6

been paying back clients to whom Simone owed money. When Simone asked which clients, Chamberlain provided no names. Simone did not think that it made sense that Chamberlain would take the money in his own name in order to issue refunds to Simone's clients. The normal practice was to issue a check in the client's name.

Simone terminated Chamberlain's employment. Simone asked Chamberlain multiple times to provide the names of the clients to whom he had refunded money. Chamberlain initially told Simone that he would get the information to him on the Friday of the week he was terminated, but he never provided any information. In a subsequent e-mail exchange, Chamberlain told Simone that he "needed more time" and was "going to provide [the information]" to Simone the following week. Chamberlain never provided Simone with any documentation of any refunds made to clients in response to Simone's multiple requests for an explanation. Chamberlain eventually stopped responding to e-mails from Simone.

Simone hired a bookkeeper and had her sort through the QuickBooks records to determine where all the money had gone. Wells Fargo provided copies of every check issued by the firm during the previous 18 months, as well as bank statements dating back to 2009. The bookkeeper and Simone calculated that the unauthorized takings had occurred between 2009 and 2012, and compiled a spreadsheet of the information in a binder. Simone concluded that Chamberlain had issued hundreds of unauthorized checks to himself and his company during that time frame. For example, for purposes of comparison, in 2008, Chamberlain wrote one check to himself each month, but in

7

2011, Chamberlain issued a total of 184 checks to himself and his company. The unauthorized checks were not recorded in QuickBooks.

Simone and the bookkeeper provided a conservative estimate that Chamberlain had paid himself $719,843.27 between 2009 and the first few months of 2012. The amount of money Chamberlain paid himself each year from Simone's account averaged more than $200,000. In contrast, in 2008, Chamberlain earned about $44,000 from Simone's business. In 2011, Chamberlain also issued checks to his mother totaling approximately $3,000.[3]

Simone had not given Chamberlain permission to take the money.

Simone also learned that Chamberlain had used Simone's account to pay for Chamberlain's share of the rent, going back to 2009. The total rent that Chamberlain had paid from Simone's account for Chamberlain's share of the rent was $18,835.26. In 2012, Chamberlain stopped paying any rent, even on Simone's behalf, to the landlord, even though he was in charge of paying Simone's law firm's bills.

Simone reported Chamberlain's conduct to the police, and San Diego Police Investigator Bernie Piceno, a member of the financial crimes unit, investigated the allegations. Piceno obtained Chamberlain's bank records and matched the unauthorized checks issued from Simone's account to deposits made into Chamberlain's accounts.

---

[3]     Chamberlain's mother did not work for Simone, and she was not a client of Simone's.

Piceno discovered numerous high dollar value withdrawals/expenditures from Chamberlain's accounts made at local casinos. An investigative auditor determined that between December 30, 2008 and February 27, 2012, Chamberlain had spent $444,255.85 at local gaming locations such as the Viejas and Barona casinos.

After an investigation that lasted approximately a year and a half, Piceno arrested Chamberlain in February 2014.

B.   *Procedural background*

Chamberlain was charged with grand theft by an employee (§ 487, subd. (b)(3); count 1); embezzlement by an employee (§ 508; count 2); forgery by altering entries in books or records (§ 471; count 3); and unauthorized use of personal identifying information (§ 530.5, subd. (a); count 4). The charging document also alleged that Chamberlain committed two or more felonies involving a pattern of related conduct that involved the taking of more than $100,000 and less than $500,000 (§ 186.11, subd. (a)(1)), and/or that involved the taking of more than $500,000 (§ 186.11, subd. (a)(2)). The charging document further alleged as to each offense that in the commission of that offense, the aggregate losses to the victim that arose from a common scheme and plan exceeded $65,000 (§ 12022.6, subds. (a)(1) & (b)) and/or exceeded $200,000 (§ 12022.6, subds. (a)(2) & (b)). Finally, the charging document alleged that, with respect to each offense, in committing the offenses, Chamberlain took funds and property of another with a value exceeding $100,000 (§ 1203.045, subd. (a)).

9

A jury found Chamberlain guilty on all of the charged counts, and found true the enhancement allegations, with the exception of the allegation pursuant to section 186.11, subdivision (a)(1).[4]

The trial court sentenced Chamberlain to an aggregate term of 10 years in state prison, consisting of the upper term of three years on count 1, concurrent upper terms of three years on counts 2 through 4, the execution of which was stayed pursuant to section 654, a consecutive upper term of five years on the section 186.11, subdivision (a)(2) enhancement, a consecutive two-year term on the section 12022.6, subdivision (a)(2) enhancement; and an imposed, but stayed, one-year term on the section 12022.6 subdivision (a)(1) enhancement.

Chamberlain filed a timely notice of appeal.

## III.

## DISCUSSION

A.  *Chamberlain is not entitled to reversal of three of his four convictions on the ground that they all amounted to a single theft offense under the authority of* Bailey, supra, *55 Cal.2d 514*

Chamberlain contends that his convictions on three of the four counts at issue in this case must be reversed because all of the counts involved thefts that were committed pursuant to a single scheme and plan, and, thus, under the authority of *Bailey*, *supra*, 55

---

[4]    The jury presumably found *not true* the allegation that Chamberlain committed two or more felonies involving a pattern of related conduct that involved the taking of more than $100,000 and less than $500,000 pursuant to section 186.11, subdivision (a)(1) because it found *true* the alternative allegation that the taking involved more than $500,000, pursuant to section 186.11, subdivision (a)(2).

Cal.2d 514, he cannot stand convicted of multiple offenses for what was a single theft offense.

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." ' " (*People v. Reed* (2006) 38 Cal.4th 1224, 1226.) However, "a defendant may be properly convicted upon separate counts charging grand theft from the same person" only if the evidence shows "that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey*, *supra*, 55 Cal.2d at p. 519.)

In *Bailey*, the defendant made a misrepresentation that enabled her to receive multiple welfare payments, each of which was less than $200, but which in total amounted to more than $3,000. (*Bailey*, *supra*, 55 Cal.2d at pp. 515-516, 518.) A jury found the defendant guilty of a single count of grand theft. (*Id.* at p. 515.) At the time of the defendant's conviction, the theft of property worth more than $200 constituted grand theft. (*Id.* at p. 518.) The trial court granted the defendant's motion for a new trial on a separate jury instruction issue, and the People appealed. (*Id.* at pp. 515-517.) After concluding that the trial court had erred in granting the motion for new trial on the jury instruction issue, the Supreme Court considered "whether [the defendant] was guilty of grand theft or of a series of petty thefts since it appears that she obtained a number of payments, each less than $200 but aggregating more than that sum." (*Id.* at p. 518.)

11

The *Bailey* court held that the defendant was properly convicted of a single count of grand theft, reasoning:

> "Several recent cases involving theft by false pretenses have held that where as part of a single plan a defendant makes false representations and receives various sums from the victim the receipts may be cumulated to constitute but one offense of grand theft. [Citations.] The test applied in these cases in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents. The same rule has been followed in larceny and embezzlement cases, and it has been held that where a number of takings, each less than $200 but aggregating more than that sum, are all motivated by one intention, one general impulse, and one plan, the offense is grand theft." (*Bailey*, *supra*, 55 Cal.2d at pp. 518-519.)

While the precise issue before court in *Bailey* involved the aggregation of separate petty thefts to constitute a single grand theft, the *Bailey* court also indicated that a defendant may not be convicted of more than one count of grand theft where all of the takings are committed against a single victim with one intention, one general impulse, and one plan:

> "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan. [Citation.] In the following cases it was held that each receipt of property obtained by false pretenses constituted a separate offense for which the defendant could be separately charged and convicted. [Citations.] Although none of these decisions discussed the rule set forth above, it does not appear that the convictions would have been affirmed had the evidence established that there was only one intention, one general impulse, and one plan." (*Bailey*, *supra*, 55 Cal.2d at p. 519.)

Recently, the Supreme Court analyzed *Bailey* and concluded that "past appellate courts have interpreted *Bailey* more broadly than is warranted." (*People v. Whitmer* (2014) 59 Cal.4th 733, 735 (*Whitmer*).) The *Whitmer* court determined that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, *even if committed pursuant to a single overarching scheme*," and "disapprove[d] of Court of Appeal decisions that are inconsistent with this conclusion." (*Ibid.*, italics added.) However, the *Whitmer* court also concluded that as a result of "the long, uninterrupted series of Court of Appeal cases, beginning with *People v. Sullivan*, *supra*, 80 Cal.App.3d 16, decided in 1978, and including *People v. Kronemyer*, *supra*, 189 Cal.App.3d 314, decided in 1987, that have consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft," the state of the law at the time the defendant in *Whitmer* committed his crimes was such that Whitmer himself could not stand convicted of multiple acts of theft committed pursuant to a single plan or scheme, despite the *Whitmer* court's new clarification of *Bailey*. (*Id.* at p. 742.) The Supreme Court held that its interpretation of *Bailey* constituted an unforeseeable judicial enlargement of criminal liability and could not be constitutionally applied to the defendant in *Whitmer*. (*Ibid.*)

Chamberlain asserts that because his crimes were committed prior to the decision in *Whitmer*, *supra*, 59 Cal.4th 733, the pre-*Whitmer* interpretation of the *Bailey* doctrine should apply to his case, and such an interpretation would require that three of his four convictions—convictions that he contends constitute "theft offenses"—be reversed. Although we agree with Chamberlain's conclusion that the *Bailey* doctrine as it was

applied prior to *Whitmer* is appropriate in this case, we disagree with Chamberlain's

conclusion that he may not stand convicted of these four different offenses.[5]

First, with respect to the offenses of altering entries in books and records (§ 471),

as alleged in count 3, and using the personal identifying information of another for an

unlawful purpose (§ 530.5, subd. (a)), as alleged in count 4, we disagree with

Chamberlain's contention that these constitute "theft offenses" as the term was used in

*Bailey*. Other courts have declined to apply the *Bailey* doctrine to aggregate multiple

forgery charges into a single forgery offense (*People v. Neder* (1971) 16 Cal.App.3d

846), or to aggregate multiple charges of the use of personal identifying information

into a single violation of section 530.5 (*People v. Mitchell* (2008) 164 Cal.App.4th 442,

456-457), reasoning that these offenses, *unlike* theft and vandalism, "do not monetize

and aggregate harm or damage." (*People v. Kirvin* (2014) 231 Cal.App.4th 1507,

1518.) If Chamberlain could have been properly convicted of numerous counts of these

offenses without aggregation under the *Bailey* doctrine, then he clearly may be

convicted of a single count of each of these offenses.[6] Indeed, section 954 expressly

allows for multiple convictions under different statutes for a single criminal act or series

---

[5]    For different reasons, we conclude in part III.C., *post*, that Chamberlain may not stand convicted on count 3. However, because the People could choose to retry Chamberlain on that count, we consider Chamberlain's alternative argument that the *Bailey* doctrine also prohibits his conviction on count 3.

[6]    As a general matter, a criminal defendant can suffer multiple convictions for a single criminal act or series of related criminal acts. (§ 954 ["The prosecution is not required to elect between . . . different offenses or counts set forth in the accusatory pleading, [and] the defendant may be convicted of any number of the offenses charged"]; *People v. Kirvin*, *supra*, 231 Cal.App.4th at p. 1517, review den. Mar. 11, 2015.)

14

of related criminal acts: "The prosecution is not required to elect between . . . different offenses or counts set forth in the accusatory pleading, [and] the defendant may be convicted of any number of the offenses charged." Although the *Bailey* doctrine has been used to require the aggregation of certain of the same offenses into a single charge of that offense, thereby providing a limited exception to the rule of section 954, it does not require the aggregation of single counts of altering entries in books and records and use of personal identifying information into a single theft offense, nor does it require the merging of single counts of these offenses with either the grand theft or the embezzlement counts.

With respect to Chamberlain's conviction for theft by an employee (§ 487, subd. (b)(3)), as alleged in count 1, and his conviction for embezzlement by an employee (§ 508), as alleged in count 2, the question whether a defendant may be convicted of both grand theft by larceny (§ 487, subd. (a)) and embezzlement (§ 503) based on the same act is currently under review by the Supreme Court in *People v. Vidana*, S224546, review granted April 1, 2015 (*Vidana*). The issue in *Vidana* is whether statutory changes to the Penal Code with respect to theft offenses have resulted in the merger of all theft by larceny and theft by embezzlement into what amounts to a single offense of "theft" that may be committed in different ways, such that a defendant cannot be convicted of both larceny and embezzlement for the same act. Chamberlain does not make this argument. Rather, Chamberlain relies on the *Bailey* doctrine to argue that because the prosecution's theory with respect to all of his offenses was "that all the acts of taking were done according to the one overall plan or scheme to obtain money from

15

the same victim Mr. Simone by appellant's use of his position as a trusted employee, who was given access to Mr. Simone's bank account and QuickBooks accounting program, and signature stamp based upon this position," all of the theft offenses with which he was charged must be merged into a single theft offense.

Chamberlain does not cite to any authority in which a court has applied the *Bailey* doctrine to merge separate counts of *different offenses* into a single offense. Rather, it appears that *Bailey* has always been applied only to aggregate multiple counts of the *same* offense into a single count of that offense. (See e.g., *In re Arthur V.* (2008) 166 Cal.App.4th 61, 67-68 [applying *Bailey* to permit aggregation of two misdemeanor vandalism offenses into a single felony vandalism offense]; *People v. Packard* (1982) 131 Cal.App.3d 622 [reversing two of the defendant's three grand theft convictions by aggregating them into a single grand theft conviction]; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 324, 364 [concluding that four grand theft convictions should be aggregated into a single grant theft conviction]; see also *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1145 [conviction for grand theft by an employee under § 487, subd. (b)(3) must be aggregated with conviction for grand theft under § 487, subd. (a)].) Chamberlain was convicted of one count of grand theft and one count of embezzlement, not two counts of grand theft or two counts of embezzlement. Unless and until the Supreme Court concludes differently in *Vidana*, we rely on the fact that grand theft and embezzlement are separate offenses that have different elements and are set out in different provisions of the Penal Code (§§ 487, subd. (b)(3), 508), as well the authority

16

of *People v. Nazary* (2010) 191 Cal.App.4th 727, 739-743, 744 (*Nazary*),[7] to conclude

that Chamberlain may be convicted of both a single count of grand theft by an employee

and a single count of embezzlement by an employee, even if both counts are based on

the same conduct. We conclude that *Bailey* does not require that we "aggregate" the

grand theft conviction and the embezzlement conviction into a single theft offense

conviction.

B.      *The prosecutor did not commit prejudicial error*

Chamberlain contends that the prosecutor committed misconduct during closing

argument by impliedly commenting on Chamberlain's failure to testify, thereby

improperly shifting the burden of proof to him.[8]

1.      *Additional background*

During closing argument, the prosecutor explained that the question before the

jury was "Did [the prosecution] prove the elements of this charge beyond a reasonable

doubt?" The prosecutor added, "Some of you might wonder why are we here. I mean,

---

[7]      The *Nazary* court concluded that "the elements of embezzlement and grand theft by an employee, and the distinction between them, continue to exist" despite the "merger of the theft offenses in section 484" that occurred in 1927 when "the Legislature 'consolidated the offenses of larceny, larceny by trick, obtaining money by false pretenses, embezzlement, and related theft offenses, in section 484 as the single crime of "theft." ' " (*Nazary*, *supra*, 191 Cal.App.4th at pp. 740, 741.)

[8]      Although Chamberlain identifies the issue as one of prosecutorial "misconduct," we agree with the People's suggestion that the scenario to which Chamberlain is referring is more appropriately characterized as a claim of prosecutorial "error." (See *People v. Centeno* (2014) 60 Cal.4th 659, 666-667 [" '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error' "].) We therefore will refer to the conduct complained of as "prosecutorial error."

17

they have bank statements.  It's obvious.  Why are we here?  . . .  [¶]  We are here because, like any of us, the defendant has a constitutional right to a trial.  He's charged with a crime.  He has a constitutional right to force someone like –like us to prove it."

Later, the prosecutor made the following statement:

> "And I want to make sure one thing is crystal clear.  We have the burden to prove this case beyond a reasonable doubt.  We have to prove the defendant is guilty.  The defense — the defendant — the defense does not have to prove innocence.  Okay.  *We have the burden of proof, but we have showed certain facts that show the defendant is guilty and backed it up with documents, mostly bank statements, mostly QuickBooks.  They have those records.*
>
> "*It could have been very easily—if our facts are wrong, it could have been very easy for counsel to point out and say you're wrong here, but they didn't because they don't exist.  Just like when Mr. Simone asked the defendant, 'Hey, you stole from me.'  And he says, 'No, I didn't.  I have proof.'  'Well, bring me the proof.'  And he didn't because it doesn't exist.*"[9]

Defense counsel did not object to these statements.  During closing argument, defense counsel stressed that the victim "was aware of what was going on."

During rebuttal, the prosecutor reminded the jury that "the proof is in the banking records.  And if there would have been any mistakes, the defendant would have told the victim when the victim demanded it."

2.     *Legal standards*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a

---

[9]     The italicized statements are the portion of the prosecutor's argument on which Chamberlain bases his contention that the prosecutor committed error.

18

denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)[10]

Absent a fundamentally unfair trial under the federal Constitution, prosecutorial misconduct or error does not require reversal of the judgment unless it was prejudicial under state law, i.e., it is reasonably probable the defendant would have obtained a more favorable verdict absent the misconduct or error.  (*People v. Bell* (1989) 49 Cal.3d 502, 534, 542; *People v. Castillo* (2008) 168 Cal.App.4th 364, 386; *People v. Crew* (2003) 31 Cal.4th 822, 839.)  If the prosecutorial misconduct or error renders the defendant's trial fundamentally unfair under the federal Constitution, reversal of the judgment is required unless the misconduct or error is harmless beyond a reasonable doubt.  (*People v. Castillo*, *supra*, at pp. 386-387, fn. 9.)

To preserve a claim of prosecutorial misconduct or error, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the misconduct or error.  (*People v. Hinton* (2006) 37 Cal.4th 839, 863.)

---

10     Although the standard for prosecutorial error under state law—" ' " 'the use of deceptive or reprehensible methods' " ' "—suggests that a prosecutor must act in bad faith, in *People v. Hill* (1998) 17 Cal.4th 800, 822-823 (*Hill*), the Supreme Court made it clear that bad faith on the part of the prosecutor is not required for a successful claim of prosecutorial error.  The *Hill* court relied on the above standards in assessing the claims of prosecutorial error in that case, despite the implication that bad faith might be required.  (*Hill*, at p. 819.)

3.    *Analysis*

Chamberlain contends that by referring to the fact that the defense had not demonstrated that the prosecution's facts were wrong, and implying that the defense had no evidence in this regard, the prosecutor "suggested that appellant had a burden to produce evidence and prove he was innocent because it implies that because the defense did not produce evidence to show the defendant was innocent, there is no such evidence." He further contends that the prosecutor's statements also constituted an improper comment on Chamberlain's failure to testify at trial.

We first note that defense counsel failed to object to the prosecutor's statements at the time of trial or to seek a curative admonition. The failure to raise the issue of prosecutorial misconduct or error at trial generally forfeits the right to appellate review of that issue. (*People v. Thomas* (2011) 51 Cal.4th 449, 491-492; *People v. Lopez* (2008) 42 Cal.4th 960, 966.) Although Chamberlain acknowledges that defense counsel raised no objection, he raises a claim of ineffective assistance of counsel on the ground that his trial counsel failed to object to the comments he challenges on appeal. We need not consider Chamberlain's ineffective assistance of counsel argument because we conclude that there was no prosecutorial error. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [when an issue of prosecutorial error has been forfeited, an appellate court can reach the merits of the issue in order to reject it].)

Chamberlain asserts that the prosecutor's statements effectively shifted the burden of production and/or proof to the defense to establish Chamberlain's innocence. As stated, the challenged statements include the following: "We have the burden of

20

proof, but we have showed certain facts that show the defendant is guilty and backed it up with documents, mostly bank statements, mostly QuickBooks. They have those records. [¶] It could have been very easily—if our facts are wrong, it could have been very easy for counsel to point out and say you're wrong here, but they didn't because they don't exist. Just like when Mr. Simone asked the defendant, 'Hey, you stole from me.' And he says, 'No, I didn't. I have proof.' 'Well, bring me the proof.' And he didn't because it doesn't exist."

The prosecutor's comments cannot fairly be interpreted as impermissibly shifting the burden of proof to Chamberlain. The prosecutor reiterated several times that the prosecution had the burden of proof to establish defendant's guilt, and expressly stated that defendant had no burden to prove his innocence. The prosecutor's comments regarding the fact that the defense could have presented evidence to dispute the prosecution's evidence and that no such evidence had been presented was a comment on the state of the evidence at trial. Ultimately, "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) The statements at issue constituted a permissible comment that the defendant had not produced any evidence to counter the prosecution's case.

Chamberlain's related contention is that the prosecutor's statements constituted error under *Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*). " '*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness

21

stand.' " (*People v. Hovey* (1988) 44 Cal.3d 543, 572.)  Chamberlin suggests that what

the prosecutor said in this case is similar to what was determined to be *Griffin* error in

*People v. Medina* (1974) 41 Cal.App.3d 438 (*Medina*).  He asserts that "because [he]

was the only potential witness, who would have the knowledge to contradict the

prosecution's case against him, and he did not testify, the prosecutor's comments

amounted to an indirect impermissible comment on [Chamberlain's] failure to testify."

In *Medina*, the prosecuting attorney noted that there had been five percipient

witnesses to the murders at issue in that case.  After doing so, the prosecutor then said

that " 'three of them were subjected to cross-examination which is a pretty sharp test of

truth, and they subjected themselves to cross-examination.' " (*Medina*, *supra*, 41

cal.App.3d at p. 457.)  It was thus clear from the prosecutor's statement that the other

two witnesses had to be the defendants in the current case.  (*Ibid.*)  The prosecutor also

said that even though the three witnesses "were not of 'sterling character,' " nevertheless,

"their testimony is unrefuted.  No one has come forward and said that it is false.  No one

has come before you to show you it wasn't that way.  You have not heard that." (*Ibid.*)

The prosecutor continued, " 'So, it is easy to get up here and reel off all the things that is

wrong with each one of these individuals and how irresponsible they are, and how they

admit they are lying about this and that, and how their minds are warped and so forth;

but where has their word been refuted?  [¶]  And they were up there on that stand.  They

were put under oath.  They were subject to perjury.' "  (*Ibid.*)

The prosecutor's statements were clearly intended as a comment on the fact that

the defendants in that case had not taken the stand and been placed under oath to *testify*

22

in their defense. As the *Medina* court explained, it was this implication that constituted *Griffin* error in *Medina*: "The net effect of these passages in combination was to urge the jury to believe the testimony of the three accomplice witnesses because the defendants, who were the only ones who could have refuted it, did not take the stand and subject themselves to cross-examination and to prosecution for perjury." (*Medina, supra*, 41 Cal.App.3d at p. 457.) However, as the *Medina* court itself noted, " '[N]ot every comment upon defendant's failure to present a defense constitutes *Griffin* error. It is now well established that although *Griffin* prohibits reference to a defendant's failure to take the stand in his own defense, that rule "*does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses*." ' " (*Medina, supra*, at p. 458.)

Here, the prosecutor argued that the defense had failed to contradict or provide an alternative explanation for certain evidence that the prosecution had presented at trial. Unlike the situation in *Medina*, this was not a case in which the prosecution's evidence could have been refuted solely by Chamberlain's testimony at trial. The defense could have presented evidence to contradict the prosecution's evidence through other witnesses, such as an accountant or even individuals who had received refunds through Chamberlain. It is not reasonably probable that the jury could have understood the prosecutor's statements as commenting on Chamberlain's choice not to testify at trial. We therefore reject Chamberlain's claim of *Griffin* error.

23

C.    *Count 3 must be reversed as a result of the trial court's error in instructing the jury*

Chamberlain contends that the trial court erroneously instructed the jury concerning the elements necessary to establish a violation of section 471, as charged in count 3, because the instruction as framed was premised on the forging of a check, rather than the forging of a "record or return," as required under the statute.

The People concede that the trial court's instruction with respect to count 3 was erroneous, and further agree that the error was prejudicial and requires reversal. We agree.[11]

1.    *Additional background*

The information alleged in count 3 that Chamberlain "did unlawfully make, forge and alter an entry in a book of records and an instrument purporting to be a record and return," and thereby violated section 471. The prosecutor submitted a special instruction prior to trial that combined the statutory language of sections 470 and 471.[12] The instructions set forth the elements and definitions contained in CALCRIM No. 1900, which addresses the crime of forgery as set forth in section 470, subdivision (a).

During discussions regarding the jury instructions, defense counsel objected to the language proposed by the prosecutor, noting that the proposed instruction referred to the forgery of a "check," whereas section 471 appears to deal with the forgery of books

---

[11]    As we explain further, Chamberlain contends that a reversal of his conviction on count 3 also requires the reversal of three of the enhancement findings. The People did not address this contention in their briefing.

[12]    The CALCRIM standard instructions do not include a standard instruction related to section 471.

or records, which is different from the forging of a check itself. She noted that section 470, subdivision (d), criminalizes the forging of checks, and that section 471 criminalizes something else, such as the altering of a QuickBooks entry or something similar to conceal the fact that a fraudulent check has been written. The trial court understood section 471 as referring to a check on the ground that section 471 covered " 'any entry in any book of records or any instrument purporting to be any record or return specified in section 470,' " and section 470 "does specify a check." The court invited the parties to brief the issue.

The trial court and the attorneys discussed this jury instruction again during trial. Defense counsel reiterated that she did not believe that section 471 applied to the forging of checks. She argued that the section 471 charge in this case was based on Chamberlain "ma[king] false entries into QuickBooks." Defense counsel proposed an instruction that tracked the language of section 471, and referred to "any instrument purporting to be a record or return."

The trial court disagreed with defense counsel's position, saying that section 471 pointed to section 470, "[a]nd 470 specifie[d] a check, which is slightly different than saying forged a check." The court provided an instruction that provided in relevant part:

> "The defendant is charged in Count 3 with altering entries in books or records, in violation of Penal Code section 471. [¶] To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant made, forged or altered an instrument purporting to be a check; two, when the defendant made, forged or altered an instrument purporting to be a check, he did so without the owner's authority; three, the defendant knew that he did not have the owner's authority to do so; and, four, when the defendant made, forged, or altered an instrument purporting to be a check, he

25

intended to defraud another. [¶] . . . [¶] The People allege that the defendant forged the following documents: checks."

2.      *Analysis*

A " 'legally incorrect theory' " refers to a particular type of instructional error, by which a jury is instructed on a "theory of the case which, if relied upon by the jury, could not *as a matter of law* validly support a conviction of the charged offense." (*People v. Harris* (1994) 9 Cal.4th 407, 419.) In other words, an instructional error occurs where a jury is " presented with a legally erroneous theory of conviction *in the sense of a theory that was not consistent with the law*." (*Id.* at p. 437.)

"[W]hen instructional error results in the jury being presented with an incorrect legal theory, reversal is required unless it is possible to determine the jury necessarily found the defendant guilty on a proper theory. As explained in *People v. Perez* (2005) 35 Cal.4th 1219, 1233 [29 Cal.Rptr.3d 423, 113 P.3d 100] (*Perez*), '[w]hen one of the theories presented to a jury is legally inadequate, such as a theory which " 'fails to come within the statutory definition of the crime' " [citation], the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless "it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." ' " (*People v. Johnson* (2015) 234 Cal.App.4th 1432, 1456.)

26

Section 471 provides: "Every person who, with intent to defraud another, makes, forges, or alters any entry in any book of records, or any instrument purporting to be any record or return specified in Section 470, is guilty of forgery." The question here is whether section 471 criminalizes the forging or altering of a check, or something "purporting to be a check," as the jury was instructed in this case.

The People concede that "[t]he plain language of section 471 does not criminalize the forging of any instrument mentioned in section 470," but instead "limits culpability to the forging of 'any entry in any book of records, or any instrument purporting to be any record or return specified in Section 470.' " (Italics omitted.) The People acknowledge that a "simple check," which is one of the items listed in section 470, subdivision (d), is not an " 'entry' into anything, nor a record." On this ground, they assert, section 471 "does not evidence an intention to create liability for falsified checks." The People's reasoning is sound.

"Our fundamental task involving statutory interpretation ' "is to determine the Legislature's intent so as to effectuate the law's purpose." [Citation.] "We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent." [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.]' [Citation.] 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts

27

will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]" ' [Citation.] ' "If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." ' " (*Simplon Ballpark, LLC v. Scull* (2015) 235 Cal.App.4th 660, 667.)

Section 471 provides: "Every person who, with intent to defraud another, makes, forges, or alters any entry in any book of records, or *any instrument purporting to be any record or return specified in Section 470*, is guilty of forgery." (Italics added.) The italicized portion is the portion relevant here. The trial court interpreted this provision as referring to the making, forging, or altering of anything "purporting to be" any item listed in section 470, including a "check," and so instructed the jury.[13] Looking to the plain language of the statute, we can determine that section 471 does not criminalize the forging or altering of *any* instrument (or anything "purporting to be" an instrument) mentioned in section 470. Rather, the relevant language of section 471—i.e., "any instrument purporting to be any record or return"—appears to be a reference to the types of documents identified in *subdivision (c)* of section 470, which makes it unlawful to alter, corrupt, or falsify "*any record* of any will, codicil, conveyance, or other

---

13    Section 470 makes it unlawful to forge a variety of items, including, among other things, "any record of any will, codicil, conveyance, or other instrument" (§ 470, subd. (c)), and "any check, bond, bank bill, or note, cashier's check, traveler's check, money order, post note, draft, any controller's warrant for the payment of money at the treasury, county order or warrant, or request for the payment of money, receipt for money or goods, bill of exchange, promissory note, order, . . ." (§ 470, subd. (d)).

28

instrument, the record of which is by law evidence, or *any record* of any judgment of a court or *the return* of any officer to any process of any court," with the specific intent to defraud. (Italics added.) The mention of an instrument purporting to be "any record or return" in section 471 parallels the language in subdivision (c) of section 470, which discusses records and returns, and appears to be a direct reference to the items identified in section 470, subdivision (c), and not the other items identified in other subdivisions of section 470. Thus, Penal Code section 471 makes it a crime to make, forge or alter (1) any entry in a book of records, or (2) *any instrument purporting to be a record or return* specified in section 470, but does not make it a crime to make, forge, or alter *any instrument* specified in section 470. The People agree that this is the proper interpretation of section 471; as the People concede, a "simple check" is "not an 'entry' into anything, nor a record."

Because section 471 does not criminalize the forging of *any* instrument that is mentioned in section 470, but, rather, criminalizes the making, forging, or altering of any entry in a book of records or any instrument "purporting to be a record or return" that is referenced in subdivision (c) of section 470—i.e., records that include wills, conveyances and judgments of court—the trial court erred in instructing the jury that it could find Chamberlain guilty of violating section 471 based on the forging of a document "purporting to be a check." As defense counsel correctly identified at trial, the basis for the section 471 charge against Chamberlain was his use of QuickBooks to alter the financial records of Simone's business, under the "makes, forges, or alters any

29

entry in any book of records" portion of section 471. (See *People v. Dunbar* (2012) 209 Cal.App.4th 114, 119 [in rejecting defendant's argument that section 471 was intended to refer only to the making, forging or altering of *public* records, the court explained that section 471 "covers the situation where the forgery leads to the corruption of financial records"].) The trial court's instruction erroneously permitted the jury to impose liability on Chamberlain under this section if the jury found that he falsified a simple check.

The People also concede that the trial court's instructional error with respect to the offense in count 3 was prejudicial. As the People note, the jury was instructed consistent with the prosecutor's flawed theory that Chamberlain could have violated section 471 by forging a document "purporting to be a check." Under such circumstances, where the forging of a document "purporting to be a check" does not constitute a crime under section 471, reversal is required unless it is possible to determine from other portions of the verdict that the jury necessarily found Chamberlain guilty of violating section 471 on a proper legal theory. (See *People v. Johnson*, *supra*, 234 Cal.App.4th at p. 1456.) No such possibility exists here. For this reason, the People agree that reversal of Chamberlain's conviction on count 3 is required.

Chamberlain argues that the reversal of his conviction for a violation of section 471 requires reversal of the jury's true findings on the enhancement allegations under section 186.11 and 12022.6. We agree with Chamberlain, in part.

30

With respect to the section 186.11 enhancement allegation,[14] the jury was instructed that the prosecution had to prove that Chamberlain "committed two or more related felonies, *specifically* grand theft by embezzlement and altering entries in books or records." (Italics added.)[15] Thus, the jury was told to rely on its findings related to counts 2 and 3 in deciding whether to find true the aggravated white collar crime

[14]   The section 186.11 enhancement was alleged twice, with two different amounts involved, pursuant to subdivisions(a)(1) (alleging the taking of between $100,000 and $500,000) and subdivision (a)(2) (alleging the taking of more than $500,000).

[15]   Penal Code section 186.11, subdivision (a) provides:

> "(1) Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3). This enhancement shall be known as the aggravated white collar crime enhancement. The aggravated white collar crime enhancement shall only be imposed once in a single criminal proceeding. For purposes of this section, 'pattern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events. For purposes of this section, 'two or more related felonies' means felonies committed against two or more separate victims, or against the same victim on two or more separate occasions.

> "(2) If the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison."

31

enhancement allegation.[16] Because the jury's conviction of Chamberlain on count 3 must be reversed, the jury's conviction on that count can no longer provide a basis for sustaining the jury's section 186.11 enhancement finding. Because the jury's true finding on the section 186.11 enhancement allegation is based in part on its factual determination that Chamberlain committed the crime charged in count 3, and because this factual determination is necessary to the jury's true finding on the section 186.11 enhancement, the true finding on the section 186.11 enhancement allegation must also be reversed.

Chamberlain further argues that the jury's true findings on the section 12022.6 enhancement allegations must also be reversed.[17] He argues that "the jury instruction

---

[16] It appears that the instruction specifically required the jury to rely on counts 2 and 3 as the basis for an enhancement finding under section 186.11 because the enhancement requires that the defendant have committed "two or more related felonies, a material element of which is *fraud or embezzlement*." (§ 186.11, subd. (a), italics added.) Counts 2 and 3 are the only counts that charged Chamberlain with offenses that involve fraud (count 3) and embezzlement (count 2).

[17] Penal Code section 12022.6, subdivisions (a)(1) and (a)(2) provide:

"(a) When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows:

"(1) If the loss exceeds sixty-five thousand dollars ($65,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of one year.

"(2) If the loss exceeds two hundred thousand dollars ($200,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of

for these enhancements . . . required that the crimes charged in the four counts be proven and if Count Three is reversed . . . then one of the four counts would not be proven and the jury would have been unable to make a true finding on this enhancement."

With respect to the two enhancements alleged pursuant to section 12022.6, subdivisions (a)(1) and (a)(2), the jury was instructed, in relevant part, as follows:

> "If you find the defendant guilty of the crimes charged in Counts 1-4, you must then decide whether the People have proved the additional allegation that the value of the property taken was more than $65,000";

> and

> "If you find the defendant guilty of the crimes charged in Counts 1-4, you must then decide whether the People have proved the additional allegation that the value of the property taken was more than $200,000."

The jury found both enhancement allegations "true."

To the extent that these instructions can be interpreted as instructing the jury that it could consider the section 12022.6 enhancements *only* if it were to convict Chamberlain of *all four* alleged offenses, we conclude that the jury's findings on these enhancements need not be reversed as a result of our reversal of Chamberlain's conviction as to count 3. First, such an instruction would have been an erroneous statement of the law under the evidence presented in this case. This was not a case in which each count alleged a separate, independent taking of some specific dollar amount,

---

> which the defendant has been convicted, shall impose an additional term of two years."

where the dollar amounts in all of the counts would have to be aggregated in order to meet the dollar amounts referred to in either alleged enhancement (i.e., $65,000 or $200,000). Rather, Chamberlain was charged with a single count of grand theft and a single count of embezzlement related to all of his takings. Thus, there was no requirement that the jury be instructed that it had to convict Chamberlain of all four charges in order for it to consider whether one or more of the counts resulted in a taking of property valued at more than $65,000 or $200,000. A conviction on the single theft count alleged in this case could have supported true findings on both section 12022.6 allegations. Therefore, Chamberlain was not entitled to an instruction *requiring* convictions on all four counts with respect to the section 12022.6 convictions.

To the extent the instruction as given may have inured to Chamberlain's benefit, he cannot now assert that the jury's true findings on those enhancements must be reversed on the ground that his conviction on count 3 was based on an erroneous instruction that must be reversed and the instruction may have erroneously required convictions on all counts. Count 3 did not allege that Chamberlain took any specific amount of money. Rather, it targeted the *means* by which Chamberlain effectuated his unlawful takings. Thus, even if the jury had not convicted Chamberlain of altering records as charged in count 3, it is clear from the evidence presented at trial and the jury's verdicts that the jury would have nevertheless determined that Chamberlain's criminal conduct involved the taking of more than $200,000. We therefore decline to reverse the true findings on the section 12022.6 enhancement allegations.

34

IV.

DISPOSITION

The judgment is reversed.  Chamberlain's conviction on count 3 is reversed; his convictions on counts 1, 2, and 4 are affirmed.  The true finding on the section 186.11 enhancement is reversed.  The remaining enhancement findings are affirmed.

The trial court may conduct any necessary ancillary proceedings consistent with this opinion, including resentencing Chamberlain with respect to all counts on which he ultimately stands convicted and all enhancements ultimately found true.


AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.